MR. AND MRS. JAMES E. COLLIER, Appellants, v.
THOMAS D. WALLS, JR., et al., Appellees.—369 S.W.
(2d) 747.

Western Section. August 30, 1962.

Certiorari Denied by Supreme Court November 9, 1962.

468

Strauch & Jones, by Irving M. Strauch, Memphis, for appellants.

Nelson, Norvell, Wilson & Thomason, by John Thomason, Memphis, for appellees.

AVERY, (P. J. W. S.). The complainant, Mrs. James E. Collier, was injured on September 13, 1960, when the front end of a truck belonging to defendants, the Alexanders, was driven against the rear end of her car driven by her, while she was stopped at a traffic directional light, by defendant Walls, an employee of the Alexanders, d/b/a Alexander Auto Parts Company.

On the 26th day of September 1960, the plaintiffs, Mary E. Collier and her husband, James E. Collier, executed a release for all their property and personal injury damages received as result of said collision.

That release is in the following words and figures:

"RELEASE

"For The Sole Consideration of One Thousand Ninety Six and 55/100 Dollars, the receipt and suf-

ficiency whereof is hereby acknowledged the undersigned hereby releases and forever discharges Gerald A. Alexander and Milton A. and Tommy Walls, their heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable or who might be claimed to be liable, none of whom admit any liability to the undersigned but all expressly deny any liability, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, and particularly on account of all injuries known and unknown, both to person and property, which have resulted or may in the future develop from an accident which occurred on or about the 13 day of Sept. 1960, at or near Dunlap and Union, Memphis, Tenn.

"Undersigned hereby declares that the terms of this settlement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise adjustment and settlement of any and all claims, disputed or otherwise, on account of the injuries and damages above mentioned, and for the express purpose of precluding forever any further or additional claims arising out of the aforesaid accident.

"Undersigned hereby accepts draft or drafts as final payment of the consideration set forth above.

"In Witness Whereof, We have hereunto set our hand and seal this 26th day of Sept. 1960.

 "James E. Collier (SEAL)
 "Mary E. Collier (SEAL)"

Mr. and Mrs. Collier now seek to have said release set aside upon the following alleged grounds:

1—No payment for her personal injuries.

2—That the consideration set forth therein, was for property damage and for the use of an automobile rented by them while her's was repaired.

3—That a mutual mistake was made by the respective parties, it being alleged that none of the parties knew that Mrs. Collier was injured or had suffered any personal injuries as result of said accident.

4—That soon after this release was executed it was discovered that Mrs. Collier did have a painful whiplash injury.

After setting out the specific matters above condensed in one to four, the original bill then alleged:

"WHEREFORE, complainant charges: That they and the defendants made a mutual mistake of a material fact when they signed said full release, and that they have not received any consideration of any kind or character for the personal injuries involved, and that they are justly entitled to have said release rescinded insofar as it relates to the personal injuries to the complainant."

Answer was filed by which defendants admit that Thomas D. Walls was the agent and driving the truck of the other defendants, Alexander Auto Parts Company, a partnership, and that he was on business for them at the time of the collision. The answer then sets up the following defenses:

1—That Mrs. James E. Collier was under the care of a physician at the time the settlement was made, all of which was known by both parties and discussed by them.

2—Deny any mutual mistake whatever in the execution of said release. That it was signed while all parties knew Mrs. Collier suffered some personal injuries.

3—Accord and satisfaction in that the release was executed on payment of $1096.55, which included the following:

1—Cost and repairs to the automobile_____$896.55

2—Medical expense incurred by complainant 70.00

3—Claim for loss and use of defendant's
vehicle _____ 130.00

Total _____$1096.55

It then alleges that the property loss, the physical injury and the use of the car all seemed exorbitant at the time the settlement was made, but in order that settlement might be made the total consideration was agreed upon, paid, and the general release executed by both Mr. and Mrs. Collier.

All acts of negligence on the part of the representative of the assured is denied; it is denied that the release should be rescinded; deny that the enforcement of the release would result in inequities or injustice and then it alleges complete accord and satisfaction of all matters involved.

By stipulation the cause was heard before the Chancellor on oral testimony on November 30, 1961, and in the Chancellor's decree he held there had been no mutual mistake of fact in the execution of the release; that it included an amount for the medical expenses incurred; that complainants knowingly entered into the release

and accepted the payments set forth therein, and that it provided for release of the defendants from all claims of every kind and character, including the damage to the automobile, the damage for loss of use of automobile and for the medical expense incurred; that the consideration was not so low as to shock the conscience of the Court, or to require that equity set it aside; and appeared to them under all circumstances to be a reasonable settlement in the purchase of the peace of defendants, and:

"That the complainants' original bill to rescind and set aside a release executed by them on September 26, 1960, be dismissed and the costs of this cause are hereby adjudged against complainants, for which let execution issue."

Much of the proof introduced in this record has to do with the involved accident, but as we view the case it is not necessary to further refer to same.

The involved car owned by Mrs. Collier is a Cadillac. She was alone when injured. Mrs. Collier states that she was hurting immediately after the accident; that she went to the restaurant owned by Mr. Collier where he worked and called Dr. Robert Ackerman, her family physician, went to his office where she was thoroughly examined by Dr. Ackerman and had x-rays of her back, neck and shoulders. She further stated that she was sore for about a week, after which time this pain eased up. She said that at the time she signed the release she had no idea she would be at an additional expense or that she would have further physical trouble. She was asked and answered:

"Q—How many blows?

"A—I was hit from behind and knocked into the other car, so I was knocked twice.

"Q—Did it upset you?

"A—Yes, it popped my neck.

"Q—Were you hurting after the accident?

"A—Yes, sir.

"Q—Now, did you read a paper they brought you when they came to settle with you?

"A—No, sir, I didn't. I just left it up to my husband there.

"Q—Did you discuss with him anything about your injuries or anything?

"A—Well, we just apparently figured that I was all right."

She was further asked if she discussed that with the claim agent, Mr. Haynes, who made the settlement with her, and her answer was:

"A—Well, I don't know definitely. I guess I told him that I felt all right."

She was asked:

"Q—How many times did Mr. Haynes come talk to you to get this matter settled?

"A—I am not exactly sure, but it was several times."

She stated that she had no conversation with any lawyer or consultation with a lawyer about the matter. She said she understood they were getting their car fixed, the rental of a car while theirs was being fixed and for the cost of the x-rays.

She said it was about a month after she had gotten the settlement on the release before she began to have any further pain as the result of the injury. She went back to see Dr. Ackerman and explained the treatments that she received thereafter. She further stated that after she realized she was hurt Dr. Ackerman called in a neurosurgeon, Dr. Cannon and Dr. Hunter, and she was put in the hospital. She described her treatment.

On cross examination she explained when she got to her husband's place of business she called Dr. Ackerman because her neck was hurting and that Dr. Ackerman told her to come out there; that she went on to have this physical examination. She said she had bruises on her body and on that occasion pointed them out to Dr. Ackerman, and that her neck was hurting and "that's why I went." She said the pain was in the "nape" of her neck and pointing out to the Court that part of the neck that she claimed hurt. She did say at that time the pain was in the back of her neck but that later it got into her shoulder and her right arm. She stated that on that occasion when she saw Dr. Ackerman first that he gave her some sedative such as aspirin. She was asked the following question on cross examination:

"Q—And did you advise Mr. Haynes at that time that you had a neck injury?

"A—I told him my neck was sore and it was hurt."

She was driving her car after a week following the accident and drove the rented car some during that first week. She worked as cashier at her husband's restaurant and it can be assumed that she was using the rented car and her car driving to and from her home to her work. She talked to Mr. Haynes about this settlement

on two or three occasions, some of which were in the presence of her husband, one of which was the day the release was signed. She did not remember whether Dr. Ackerman told her to come back in about a month, when he first saw her, and in her explanation in that regard she said:

"Well, I won't say that is a fact because I don't know for sure about that, and as long as I was feeling good there, I didn't want to go back, and I didn't want to incur any more bills than was necessary, and if I thought it was necessary, that it was just a muscular condition that I could take care of at home after talking to him on the phone, I didn't want to make another bill."

In explaining why she signed the release 13 days after the accident she was asked whether or not the signing was six or seven days after her pain ceased and her answer was, "since the soreness had eased up."

She saw the check and saw it delivered to her husband that day, and it was endorsed by her personally. She further said that when the check was received she did not expect Alexander Auto Parts Company to ever pay any other amount.

In the course of cross examination she was asked if any other insurance company paid her medical bill, and at that point she asked the Court to let her make an explanation, which she did, and said:

"We had our liability, and I did not think I was hurt and so we did not collect from them until months later after we realized the condition I was in and the cause of it, and they paid off."

In that connection the Court asked several questions. She stated that she was given an opportunity to read the release here involved, but she did not read it at the time she signed it.

In further cross examination she said the pain returned approximately a month after she signed the release. She was asked and answered:

"Q—And where was that pain?

"A—In my neck.

"Q—The same place as before?

"A—Like I said before, it started in my neck first, and the next time it would be a little further down in my shoulder until it worked into my arm.

"Q—Where was it in your neck, the same place as it was before?"

"A—Yes."

At the time she testified in this case she said it had been six months since she had any doctor. Her testimony indicates that no notice was ever given to U.S.F. & G. with respect to the medical reimbursement policy until about two months before this lawsuit was tried.

The next witness, James E. Collier, testified that when the collision occurred his wife called him and he told her to go to the doctor, that neither of them thought at that time that she was hurt. He states that he recalls he told the man, which is assumed to be the claim agent, that "I didn't want any personal claim."

His statement is that the claim agent wanted to know if he had seen the car, that is the Cadillac that had been

in the collision, if he had seen the doctor, if he had gotten the bill from the Rental Agency for the rental of the car. On direct examination he was shown what is referred to as a charge authorization that had marked on it "U.S.F. & G." and also "State Farm." He claims he does not know how U.S.F. & G. got on that ticket and says he paid the $130.00 for the car rent. He then states that he never made any charge for injuries to his wife until in May of 1961. It can be inferred that is the date when U.S.F. & G., their medical expense carrier, was notified. He said the involved claim agent saw him quite often and that he didn't settle it before because he didn't have the bill. He says, "I settled it when I got the bills." He then states that no discussion of the personal injuries was had by him, but that:

> "I told Mr. Haynes that we weren't that type of people that were out chasing after ambulances and wanting something for nothing."

He contends that the release was not discussed and that he didn't read it. He says medical bills and future medical bills were not discussed; that he anticipated no "future medical bills." He was asked by the Court what time the claim agent came to his place of business and he said it was after lunch or about 2:30 to 4:00 in the afternoon, he explained that he was busy by virtue of the fact certain shifting crews at the postoffice came in for lunch at different times during the day. He says his wife didn't complain about her soreness until about 30 days after the release had been signed. He procured competitive bids on repairing the car and wanted it repaired by the one who offered the highest bid.

On direct examination he was asked specifically about why he charged this refinishing job that was done on the car amounting to $17.00 and he said he wanted that done because the new parts that were put on the car contrasted with the old parts and to do this refinishing job made it all look alike. He said the claim agent made no contention that this $17.00 item was a doubtful claim. He told about expenses incurred after executing the release and estimated that at around $1,000 plus some for doctor bills and medicine after her pain returned and said he did make a claim against U.S.F. & G. for such hospital and medical expenses. He was asked if he didn't call Mr. Alexander, the employer of the boy that was hurt in the same accident on that day, and offer to help with medical expense, and he explained:

"I called to find out and I thought if he was needing a transfusion or something, to let me know."

On cross examination he was asked if he didn't find out Mr. Alexander was insured by the State Farm Insurance Company, and he said, "It could have come in." There were some questions asked by the Court because it was apparent the witness was evading direct answers and the Court finally said:

"Now, Mr. Thomason's question is did you learn in that conversation that he did have insurance?

"THE WITNESS: No, sir, not that I remember.

"THE COURT: When was it you first knew that his insuror was State Farm?

"THE WITNESS: The adjuster came down to see me."

And then he added in response to question from counsel for defendant that this was when he found it out, "if I remember correctly." He said, however, that Mr. Alexander could have informed him about that in that conversation and explained, "It has been a long time ago," saying "I don't know." He continued to show an evasion in connection with answering questions direct, saying that he didn't call him for that purpose, but he talked to him about the boy. And then finally when he was asked:

"Q—Did you ask him while you were talking to him who had his insurance?

"A—I just don't remember. I want to be truthful about the thing, but the primary thing I called about was to see about the boy, because she told me they had to take him to the hospital, and I was concerned about him."

He rented a car the next day after the accident from the Avis System on Main. He was shown the receipt that he gave at the time he rented the car. He admitted that he signed it, but would not admit or deny the correctness of the date, however, the receipt shows it was dated the 21st of September and that he gave the information shown on that receipt showing where he lived, street number, etc. He admitted that he gave all that information and then he was asked to read over in the lower right hand corner where it shows, "Charge Authority, U.S.G. & F." and the policy number. His explanation was:

"I had my insurance with U.S.F. & G. so that could have been where it comes in, if they wanted to know who I was for identification purposes. I had that

business in my pocket—you know that they give you your number—and I could have shown that to verify my name. I think that is where that must have come in from, because I just showed them that so they would know I was James Collier, and I suppose they have to have some kind of identification and I showed them this card there so he would know who I was.''

He was then shown the quotation ''State Farm,'' this was marked Exhibit 3. He said he was the one that entered into the discussion with Mr. Haynes about the settlement, rather than his 'wife. He admitted that the difference in the two estimates on the repair of his car is approximately $150.00. This witness was completely evasive in practically every question asked him that had any significance in connection with the settlement made.

On cross examination when he was asked if he and his wife didn't know she was to go back to the doctor within a month, and then he said the doctor didn't find anything, but:

''* * * He said it was a little muscular difficulty and he thought it would pass, and it did pass, and she didn't think there was any need to go back.

''Q—I believe your wife said her pain lasted for about a week. Did Mr. Haynes come back by to see you after her pain had quit?

''A—She wasn't hurt. She was, but then after a week it had quit.

''Q—Was that when you settled with him, or was it another time?

''A—I don't know whether it was that particular

time or not, but she said the pain was gone out of her neck and shoulder.''

It is significant that in addition to "neck" he also said "shoulder."

The evasiveness with which this witness was answering the questions, which the Court was bound to observe, is represented in his answers to the following questions:

"Q—And you had your Cadillac after about a week?

"A—No, sir, I did not.

"Q—How long did it take you to get the Cadillac back?

"A—About seven days, about a week.

"Q—About the time your wife's pain was over, about that time you got your Cadillac back?

"A—That's right. She wasn't hurting when he brought it back.

"Q—But you didn't settle this case about a week after the accident; you waited another week, almost two weeks?

"A—I didn't have the bills in on the thing, and I didn't have the bill in on the Southern Motors and they hadn't got through with the car, and I know he came down two or three times to settle and I hadn't been out there to get it."

This receipt shows the figures for repairs $879.55 and then added to that is "wax and polish" $17.00, making the total $896.55. His answers were so evasive that the Court had to keep on reminding him that the answer

was not responsive to the question and call the witness' attention to the fact that the question was—repeating it. This repair bill is marked Exhibit 4. He said he knew what these bills were on the 21st but that he didn't settle until the 25th, and when asked why he didn't settle with Mr. Haynes on the 21st, he said he did not have the medical bill, but denied that settlement was delayed because he was afraid he would have further medical expense. He gave as excuse for not having settled before that he didn't have the doctor bills and then admitted when he did settle he didn't know whether he had the bill from the doctor then or not. He was asked:

"Q—Do you remember Mr. Haynes suggesting that you call instead of him because it would probably be easier for you to get the information?

"A—I talked to Mr. Haynes.

"Q—I am talking about on the 26th of September when the release was signed. Could that have happened?

"A—It could have happened or it could not have happened. I just don't remember."

But he admitted he received the check for $1096.55 on the 26th of September and that he knew it included all the items mentioned. He explained that he didn't read the release and said he didn't think it was necessary to read it because the check was there ready to be given him "for what I had been out." He was then asked:

"Q—Did Mr. Haynes tell you it was a full release and this was the end of your claim and you wouldn't get any more money?

"A—I didn't expect any more."

Then the Court had to call his attention to what the question was and the witness answered, "No, sir." The Court then asked:

"Did you think you could sign this paper and accept this check and later on collect more money?

"THE WITNESS: No, sir.

"THE COURT: Did you realize when you signed this check, you were settling any and all claims you had against the company?

"THE WITNESS: That is all I had against them, was the automobile repairs and the other incidentals was all I had."

He said he knew what the word "release" meant, and he was asked:

"Q—What did you think that you were signing when you signed this?

"A—Signing it to get the bills paid."

Mr. Collier admitted that he discussed with Mr. Haynes, the claim agent, that his wife's neck was a little sore, and said:

"She had been to the doctor and I had the doctor bill, and I had the car bill and I had that bill, and that was all of it, and that was all that was necessary.

"Q—And you knew that this check you received included any personal injury—(interrupted)

"A—She didn't have any personal injury.

"Q—Well, such as she had?

"A—I didn't think she was injured. If I had thought she was injured, I would have never signed it. She said she was not injured; she was a little sore, and that was going to be about it.

\* \* \* \* \* \*

"She wasn't injured. The man didn't tell her she was injured. He took the x-rays and said it looked like a little muscular injury; it was muscular."

His answers were so evasive the Court again called his attention to the fact that he was not answering the questions that were asked, the Court saying:

"THE COURT: What he is trying to get at is this question. Did you know that in addition to the repair bill to the car and the rental car that there was expense incurred by the insurance company as a result of a claim that your wife had an injury?

"THE WITNESS: Yes.

"Q—Then you did know that?

"A—I did know that they paid for the x-rays.

"Q—And you knew when you signed this release that that was included in the release?

"A—That the doctor bill was included in the release, yes.

"Q—And the compensation for her injury as you knew it at that time?

"A—Yes, sir.

"Q—So you knew that was included in this release?

"A—There was supposed to be no injury whatsoever, just a little muscular ache, and that was to take

care of the doctor bill that was incurred that I was out of because of this accident. It wasn't any bill I had paid two months or three months ago; it was just money that I had to spend after this car hit her, and he was paying that particular item, and that is all I wanted him to pay.''

The following examination took place by the Court:

''Q—Let me ask you this question. If you had read the release and it said something like this, 'Release from all claims, demands and injuries whatsoever and particularly on account of injuries, known or unknown, both to person and property, which have resulted or may in the future result from an accident which occurred on or about the 13th day of September, 1960 at or near Dunlap and Union Street, Memphis, Tennessee,' if you had read that phrase, you would have known, would you not, or what would have been your conclusion as to the future claims for Mrs. Collier's injury?

''A—Well, I guess, sir, at that particular time there wasn't any injury there.

''Q—No, my question is, if you had read this paper and had read that which I have just recited, a release of any claims, accident and so forth, particularly on account of all injuries, known or unknown, both to person and property which have resulted or may develop in the future, would you have thought that you were executing and releasing the company from anything that might develop thereafter or not?

''A—If I had read that, I would have tried to look it over and see if there could be a provision for it or in case something would happen.

"Q—And without a provision of that character, your conclusion would have been that you couldn't get any more money, is that right?

"A—Well, I don't want any money from these people. I just want the bills."

At the conclusion of the testimony of Mr. Collier the plaintiff offered to the Court Tommy Walls, the driver of the truck involved for such examination as the parties wanted to make. Counsel for plaintiff cross examined the witness whose testimony simply was that he was in the outside lane and when he reached the point near where this collision occurred he switched over from behind other cars into the center lane and just as he switched over all of the cars in front of him stopped, he put on his brakes and skidded about 50 feet, hit the rear end of the Cadillac, at which time his head went against the windshield, was cut and required about 21 stitches.

The only witness introduced on behalf of the defendant was the claim agent, David F. Haynes, who said he had notice of the collision the day after it happened. That he first contacted Mr. Walls and secured a statement from him. Next he contacted Mrs. Collier and he states:

"* * * She told me that she had a neck injury and that she wanted me to talk with him about it, and so I contacted Mr. Collier at his place of business."

Mr. Collier said Southern Motors and Douthit-Carroll were running estimates of the damage to the Cadillac and that Mr. Collier told him Southern Motors was going to fix his automobile because there wasn't anybody but Cadillac dealers who could fix the Cadillac like the Cad-

illac people could. He talked to Mr. Collier about the whole matter and he quotes Mr. Collier as having said:

"Southern Motors, they are going to fix my car, I already know about these type of claims, and my wife has got a neck injury. I don't know about the way they do about that, but I know all about how these neck injuries are built up and bring about large amounts in lawsuits, in fact, I could get this one right now; I know I could build this one right up and make a good damage suit out of it, because Strauch & Jones represents me on my restaurant business—but on looking at you, I think that you are a right nice fellow, and probably we will be able to get along."

The witness then testified that Mr. Collier told him at that time that he was going to rent a car to be used while his car was being repaired, and that the witness informed him that since he had another car he would have no "loss of use claim," and to that Mr. Collier replied, "By George, I will." The witness said they discussed the fact that Mrs. Collier said that she was injured, had some pain and that he thought he would wait a while and see just how long it would take her to get well; that she had gone to a doctor and that the doctor "had prescribed heat massages in general," and she was going back to the doctor. Between that first conversation and the settlement date, that he checked with Mr. Collier three times. The witness stated that he was aware of the fact that he was dealing with a personal injury case the very first day he talked with Mr. and Mrs. Collier. He quoted Mrs. Collier saying:

"Now, I want my husband to look after this, he will be concerned about the automobile, which actually is mine, and he will be concerned about my injuries."

The witness later stopped by the restaurant and saw Mrs. Collier there. He was asked to describe just what took place on the day of settlement, and he went into a rather long narrative of when he went in the restaurant some stranger was there. Mr. and Mrs. Collier and this stranger was discussing dogs with Mr. Collier standing at the cash register, and that Mr. Collier said:

"I have got the bills here on the rental of that automobile. I went ahead and rented a car, and I have paid it off myself, and I have already got my car back also and I want to get settled up."

This witness said he again told them the company would not pay for the loss of use of the car or rental on the hired car, but that he was going ahead and put that amount in and let it be a part of the damages for Mrs. Collier's "neck injury," and that Mr. Collier remarked, "That didn't make any difference whichever way it was paid, just so it got paid." He then said he didn't have the doctor's statement and he requested Mr. Collier to call the doctor while he was there and get the exact amount of the doctor's bill and that Mr. Collier did so and said it was $70.00, which amount was added to the other items and the release made out for the whole amount and the check delivered. The witness said in that discussion that he said to Mr. Collier:

"You know, you didn't want to sign anything before; you kept telling me about your wife being hurt and you didn't know how long she was going to be hurt, but it appears that you and I are fixing to reach a

settlement here today, and I need a doctor's report in my file to show that your wife was hurt there, which is what you and I have been talking about, but I need something in writing from him to show to my company."

That then they signed a paper authorizing him to get a report from Dr. Ackerman, and that Dr. Ackerman did write up the report and forward it to him. This particular witness says he explained to Mr. Collier he was going to put in $130.00, $70.00 and the $17.00 for the car waxing, as a matter of personal injury settlement in connection with his wife's injury and that he would have to have a release for all of the items paid as well as any unknown injuries and thereupon he filled in the printed form of release, made out the check and the whole matter was settled there at that time.

This witness explained that the company had a code indicating settlement for different items and that the code for personal injury settlement was the figure 100, which code figure was placed on the check, together with the number injured, and that there was found on this check these figures, "100-1" and out to the side was written $217. He also said the code symbol for property damage was the figure "200" and that he put that code symbol on the check, put the dash 1 by it and amount of the property settlement $879.55, and that all of this was done there in the presence of these witnesses on the 26th day of September, 1960.

The witness further stated there on that occasion Mrs. Collier said, "Well, my neck still does bother me a little bit." That Mr. Collier then took the paper known as the release and read it loud enough so that this witness

heard him read the whole thing and then the witness said he asked him, ''how does it look?'' and Mr. Collier said, ''well, it is a full release,'' and that Mr. Collier looked at his wife and then said to her, ''Don't sign this unless you think everything is going to be all right;'' and Mrs. Collier remarked, ''Well, I guess I feel very well, but I don't know,'' and then said ''we will sign it and it is a full release; just give us a check.'' Thereupon the release was identified and filed.

On cross examination he was asked if he showed the Colliers the medical report that he got and he stated that he did not because they had had an opportunity to have it if they wanted it, and could have gotten it from the doctor three weeks before he got it, saying that the form that was to be filled out by the doctor was given to them about that length of time before the settlement was made. That included the authorization statement for the medical report, which Mr. and Mrs. Collier did not sign until the day of settlement.

On cross examination he was asked if he explained to Mr. Collier what these code symbols meant on that settlement, such as the 100 symbol and 200 symbol and the witness said Mr. Collier asked him about those figures and that he told him what they meant. The witness was carefully and minutely cross examined by counsel for the plaintiff, but there was no variation from the substance of what he had said on direct examination. This witness denied that he acted hastily in settling the claim, saying that Mr. Collier was the one that wanted the settlement made and when Mr. Collier got ready to settle it he settled it.

On cross examination the witness, in answer to an interrogatory, said that he, on the occasion of the settlement, said to Mr. Collier: "You understand Mr. Collier, this is a full release?" and that Mr. Collier after he read it, said, "I certainly do." The witness said he didn't anticipate that Mrs. Collier would have to go to the hospital after that release was executed and he didn't know that she ever did.

Mr. Earl Alexander, of the Alexander Auto Parts, was introduced and said that on the day of the accident a man called him and identified himself as Mr. Collier. When asked the purpose of Mr. Collier's call, he said:

"I don't remember the exact words, but he introduced himself as Mr. Collier, the husband of the lady who was involved in the accident that Tommy had been in."

And that this man called him and asked him if he had insurance and what company he had it with, he told him that he did have insurance with the State Farm Mutual, and Mr. Alexander said he inquired whether or not his wife was injured seriously or what her condition was, and that Mr. Collier said "that they didn't know how seriously she was injured or anything like that. She had, he thought, some whiplash injury."

On cross examination the witness said that Mr. Collier told him he didn't know how badly his wife was hurt and that he asked how the driver was, he thinks, but he is not certain that that was asked.

Mrs. Collier was called back to the stand and she denied that Mr. Collier read aloud the release there at the time it was executed, Mr. Collier was called back to the

stand on rebuttal and said about the same thing, and he was also asked, if when he called Mr. Alexander on the day that this accident occurred, whether he told him that his wife had a whiplash injury and he said, "I did not tell him that." He also denied that he ever told Mr. Haynes that his wife would be going back to the doctor in about a month, and he was asked and answered:

"Q—Did you turn to your wife before you signed the release and asked her if she was hurt or not?

"A—She said she thought she was all right, everything was going to be all right, she wasn't hurt."

The witness explained that he had been arrested in connection with what is referred to "scalping tickets" in connection with football games and had a case in Court on September 23, 1960, and that at that time he was represented by Mr. Strauch and Mr. Jones, who are his regular attorneys. He did say, however, at the time of the release he had no lawyers looking after that part of his activities.

At the close of all the proof, argument of the case, the Court made a statement which is carried into the record, of several pages, commenting upon the issues in the case, and then said:

"The sole question is whether or not this release was executed by Mr. and Mrs. Collier under a mutual mistake of fact, and in that mistake, Mr. Haynes, the adjuster for the insurance company representing or insuring the defendant, Alexander Auto Parts, whether he joined in that mistake or whether he was likewise mistaken."

The Court commented that he was not impressed with the fact that the claim agent felt that Douthit-Carroll, the low bidder on the repairs should have been awarded the contract, nor was he impressed with the fact that Mr. Haynes did not feel that they should pay for the use of the car that had been hired, because as a matter of fact it had been added in the settlement. He further stated as he commented on the case as to what the witnesses said:

"I don't buy everything Mr. and Mrs. Collier have said, nor do I buy everything that Mr. Haynes has said, and I think he settled on the basis of the property damage of $896, and I think he settled it on the basis of a rental car as an expense incident to the claim, but the question that gives me more consideration than anything else is the payment of $70 as the doctor bill."

Then he commented with respect to the payment of that $70:

"Whether it was paid to the doctor or whether it was paid to Mr. and Mrs. Collier themselves, this was an additional sum paid for injuries connected with or arising out of or associated with personal injury independent of the property damage, and the Court is of the opinion that when that amount was paid, so far as Mr. Haynes was concerned, he paid it in settlement of a personal injury claim."

He further stated:

"I am constrained to say that I think so far as the testimony of Mr. and Mrs. Collier today shows that they sincerely thought that she would have no further trouble, that she had recovered."

He went on to say:

"The Court cannot feel that an individual, a man of the intelligence and of the business experience that Mr. Collier has quite obviously had, that he can say, 'I was presented with a receipt and release, a solemn written instrument, and either because of confusion or because of excitement or because of lack of concern, I didn't read it, and now I want to set that aside.' or 'I want to set that aside because I was mistaken as to what might happen hereafter,' or 'I was mistaken because my wife had a personal injury which I did not think she had'."

So the Court finally said:

"* * * under those circumstances the Court must hold that the complainant has failed to carry the burden of showing that by clear, cogent, and convincing proof that there was a mutuality of mistake, and that under the facts and circumstances as they then existed, the damage or the consideration or the additional compensation, $70 in this case, was so outrageous, so inadequate, or so out of proportion to what might have happened in the future as to justify the setting aside a solemn, written instrument executed by the parties."

This case was tried solely on the issue set up by the pleadings. The only issue stated in the declaration was that of a mutual mistake. There are six assignments of error, but when examined carefully they pose only one question:

DID THE PARTIES ALL KNOW THAT MRS. COLLIER HAD SOME PERSONAL INJURY

GROWING OUT OF THE INVOLVED COLLISION AT THE TIME THE RELEASE WAS EXECUTED?

In answering this question we must remember that this record does not show one line of medical proof. We do not know what the medical report of Dr. Ackerman, referred to as having been made, shows, and we do know that Mr. and Mrs. Collier both said that Dr. Cannon and Dr. Hunter cared for her later on when she had developed this alleged condition in her cervical spine. We do know that all the parties had access to the medical report and neither introduced it as evidence.

 The rule regulating mistake so as to void a settlement release entered into, with no fraud involved, is well stated in Metropolitan Life Insurance Co. v. Humphrey, 167 Tenn. 421-426, 70 S.W.(2d) 361, 362, where it is said:

"Mutual mistake as to the nature or extent of injuries is considered good cause for avoidance of a settlement, but the mistake must relate to a past or present fact, not an opinion as to the result of the known fact. A mistaken guess or mistaken opinion as to how far into the future a disability from a known injury may extend would not justify a court in setting aside a settlement, as in this case where the insured and insurer, with knowledge of the facts and acting in good faith, rested the contract upon their opinion that the disability would end within the period covered by the sum paid in settlement of the policy. *Where one assumes the chance, as insured did here, he is bound by the settlement.*"

(Citing several cases from many jurisdictions supporting that statement.) (Emphasis added)

Certainly a person who had admitted to the claim agent, her family physician who carefully examined her, and to her husband that her neck and cervical section were in pain, sore and continued for one week, binds her contract of settlement release.

In that same case, 167 Tenn. at page 425, 70 S.W.(2d) at page 362, it is said:

"The doctrine of rescission for mistake of fact is an invasion of the rule that contracts voluntarily entered into are enforceable. But, when a mistake results from unconscious ignorance or forgetfulness of the existence or nonexistence of a fact, past or present, material to the contract, a court of equity will rescind. Pom.Eq.Jr. sec. 839; Kerr's Fraud and Mistake, 432. But it will not release a party from the consequences of voluntary *compromises or speculative contracts made with knowledge of the facts and which turn out differently from what was expected.*" (Emphasis added)

45 Am.Jur. page 685, heading "Release," it is said:

"The great weight of authority supports the doctrine that a release of a claim for personal injuries cannot be avoided merely because the injuries have proved more serious than the releasor, at the time of executing the release, believed them to be, or because the releasor made a bad bargain on account of a wrong estimate of the damages which would accrue."

Under the same heading, page 686, it is said of "mutual mistake":

"Where a release is given with reference only to known injuries, and it subsequently develops that a substantial injury then existed which was unknown to the parties and not taken into consideration, the release may be avoided on the ground of mutual mistake. *Where, however, the release expressly so provides, subsequently discovered unknown injuries will not support an action for its avoidance.*"

■ It goes without saying, and needs no authority to support it, because they are too numerous, that in the absence of fraud, misrepresentation, or unfair dealings, mere inadequacy of consideration is not sufficient to set aside a release of a tort claim. Inadequacy of consideration is one element that may be taken into consideration whenever there is fraud intermingled with the settlement involved, but the mere inadequacy of the claim is not sufficient in and of itself.

■ A mutual mistake as regards the rights of parties to reformation of a release is a mistake common to all the parties to the written contract or the instrument or in other words it is a mistake of all the parties laboring under the same misconception. A mutual mistake from which equity will afford relief, is one where both parties participated in that mistake with the same mistaken conception. See Words and Phrases, Vol. 27A, subject "Mutual Mistake" for other definitions.

It is rather strange how that it can be argued that there was a mutual mistake in the instant case. Mrs. Collier and Mr. Collier on the one hand knew that her neck was sore for a week after this accident had occurred. They both testify to that fact. They knew that she had an injury caused by a collision jar on the back of her auto-

mobile, and common knowledge would indicate that such a jar, accompanied by several days soreness and pain, was calculated to cause a back injury. They both knew that she was suffering immediately after the accident occurred, and that she went to her doctor and had x-rays made by him. They knew the location of these pains in her neck and in between her shoulders, and the insurance company, acting for defendants, through its claim agent, knew that same thing. It knew the facts; how the accident occurred; that the doctor had been advised with and had ordered the x-rays made and they were made; knew that Mrs. Collier said that her neck was sore and hurt. In other words, there was nothing concealed, apparently, by either of the parties from the other.

In support of the contention of the plaintiffs, counsel for them have cited two unreported opinions from two cases that were determined by this Division of the Court of Appeals, one of which also decided by the Supreme Court and this Court affirmed. That is the case of Young v. Lewis of Delaware, Inc. The facts of the instant case and Young v. Lewis of Delaware, Inc., are not even comparable. In Young v. Lewis of Delaware, Dr. Young had experienced no pain whatever, he had some damage to his automobile, he had no x-rays made whatever, he had stated that he had no injury, and both the claim agent who just paid property damage alone, and Dr. Young thought there was no injury. He consulted no physician. It was not a question of extent of an injury, as has been said by counsel, for in the Supreme Court opinion which is before the writer of this opinion, in the Young case, Justice Tomlinson said:

"The petitioners contend that the release executed in this case was not made pursuant to a mutual mis-

take of fact, but that the complainant was simply mistaken in how seriously he was injured and that it was a simple mistake of opinion, as in the case of Metropolitan Ins. Co. v. Humphrey, supra.

"In the Humphrey case the facts were different from those in the present case. Both Humphrey and his doctor knew the extent of his injury but it was their opinion that he would be well within the time of disability settled for. Upon reading the Humphrey case it will be seen that we there recognized that a rescission might be granted under facts as appearing in the instant case."

In the case of William G. Gately v. Harold L. Strider, which case was decided in the same Court in Shelby County, Tennessee, and by the same Chancellor as the instant case, the complainant claimed only property and no personal injury damages, but he had directed his wife to settle the claims in accord with his instruction and to execute a release. She executed that release but in doing so she stated that her husband had no physical injury, he had consulted no physician, and it later developed that he had an herniation of intervertebral lumbar disc, which had to be removed by surgery. There was medical testimony in that case based on examination by physicians after the release was executed. While in the instant case the parties did not have to tender amount they had been paid, however, in the Gately case there had been paid $527.70, which was $50.00 less than the actual amount of the damages, which was a deductible item, and that amount was tendered back to the Court. The Court found that there was a mutual mistake in that case and ordered a rescission of that contract or release which recited that he had no personal

injury. It also appeared in the Gately case that the little pain that Mr. Gately had was in the lower part of the back, and not in the upper region of the back and neck as is positively shown in the instant case. In that case we said:

"It is a case where simply both the insurance companies carrying the liability of the defendant and the complainant personally thought there was no compensable injury and settled only for property damages."

The case of Metropolitan Life Ins. Co. v. Humphreys, supra, is referred to in the annotations appearing in 48 A.L.R. 1462 and 117 A.L.R. 1022, in which the question of mutual mistake is fully discussed. Of course, in that annotation there are opinions referred to from other jurisdictions, and while we do not believe it is necessary to refer to opinions from other jurisdictions, we think it proper to set out here what is said in the contention of counsel for defendant that Tennessee follows the general rule which is discussed in that annotation, and so far as Tennessee is concerned the rule which the annotation carries along as part of our adopted rule, is as follows:

"There are numerous cases supporting the doctrine that a release of a claim for personal injuries cannot be avoided on the ground of mistake, merely because the injuries proved more serious than the releasor at the time of executing the release believed them to be.

"The question in each case is whether the minds of the parties met upon the understanding that the payment and acceptance of the consideration were in full settlement of the releasee's liability; if they did,

without fraud or unfair conduct on either side, the contract must stand, although subsequent events may show that one of the parties made a bad bargain because of a wrong estimate of the damages that would accrue. And the release will not be set aside merely because the injury proves permanent instead of temporary, the rule applying that where parties knowingly and purposely made an agreement to compromise and settle a doubtful claim, whose character and extent is necessarily conditioned by future contingent events, it is no ground for voidance of the contract that the events happened differently from the expectation, opinion, or belief of one or both of the parties. And the doctrine indicated applies even though the consideration proves grossly inadequate in view of the injuries which subsequently developed.

"The doctrine of these cases is just one under some circumstances where the parties should be regarded as contracting with reference to future possibilities, and especially where the mistake on the part of the releasor was not induced by any representations of the releasee's physicians or agents since otherwise any settlement might be imperiled on a subsequent claim by the releasor that his injuries were greater than he, at the time, anticipated." 48 A.L.R. 1464.

"To justify setting aside a release on the ground of mutual mistake, the mistake must be as to the past or present fact material to the contract, Doolgner v. Dayton Co. (1931), 182 Minn. 588; 235 N.W. 275.

"That injuries for which settlement was made resulted in disability not anticipated at the time it was made is not such a mistake. Ibid.

"That is to say the mistake must relate to a past or present fact, not an opinion as to the result of the known facts, Metropolitan Life Ins. Co. v. Humphrey (1934), 167 Tenn. 421, 70 S. W. (2d) 361."

■ Rules governing mutual mistake relating to the voidance of contracts entered into without fraud, duress or imposition as herein stated as related to the facts of this cause, it seems that to uphold the contention of complainants would be nothing short of extending the doctrine of rescission so as to create an unwarranted invasion of the rule that "CONTRACTS VOLUNTARILY ENTERED INTO ARE ENFORCIBLE."

The result is that all assignments of error are overruled. The decree of the Chancellor is affirmed. Decree will be entered in this Court is accord with this opinion, together with the judgment for costs against the appellants and the sureties on their appeal bond. Decree accordingly.

Carney and Bejach, JJ., concur.