# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
## JOSEPH  R. PATTON, JR., ET UX. v. MICHAEL KRUSZEWSKI, ET AL.

**An Appeal from the Chancery Court for Shelby County**
**No. 105139-1     The Honorable Walter L. Evans, Chancellor**

---

**No. W1998-00133-COA-R3-CV - Decided April 14, 2000**

---

This is a misrepresentation case in a real estate transaction.  Plaintiffs purchased a home from defendant, Michael Kruszewski, and defendant, Sandra Goodman, who acted as the real estate agent for Kruszewski.  Plaintiffs filed a suit for rescission and money damages.  After a non-jury trial, the trial court found that both defendants were in violation of T.C.A. § § 66-5-201 - 66-5-210, by failing to disclose foundation problems in the house and awarded damages to plaintiffs.  Defendants have appealed.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

CRAWFORD, P.J., W.S., delivered the opinion of the court, in which HIGHERS, J., and LILLARD, J., joined.

Robert B. Gaia, Memphis, For Appellant, Michael Kruszewski

Roger A. Stone, Memphis, For Appellant, Sandra Goodman (Kruszewski)

Manuel P. Scarmoutsos, Memphis, For Appellees

## OPINION

JUDGE CRAWFORD delivered the opinion of the court.

Defendants, Michael Kruszewski and Sandra Goodman, appeal the judgment of the chancery court awarding money damages to plaintiffs, Joseph R. Patton, Jr., and Rebecca Cox Patton.

On January 18, 1995, the Pattons filed a complaint against Kruszewski, Goodman, individually and as an agent for Coldwell Banker Germantown, Coldwell Banker Germantown,[1] and

---

[1]     After the December 17 - 18, 1997 trial the chancellor entered an order December 22, 1997, finding that Goodman was acting as an independent contractor with regard to the transaction

GMAC Mortgage Corporation[2], alleging inadequate disclosure of faults with residential property as required by T.C.A §§ 66-5-201 through 66-5-210, fraud, negligence, and breach of implied warranty. The complaint seeks rescission of the contract or in the alternative compensatory and punitive damages.

Kruszewski's answer denies that the condition of the property was not disclosed to the Pattons at the time that the contract was entered into and avers that the Pattons' agent, Randy Mayall, provided Kruszewski a disclosure report which was completed on or about August 11, 1994, and returned to Mr. Mayall, specifically containing information concerning the foundation. Kruszewski admits that there were problems with the foundation which had been corrected prior to his purchase of the property and that these defects where disclosed to the Pattons by the disclosure report. Kruszewski admits that his agent, and now wife, Sandra Goodman, contacted the contractor who had previously made repairs to investigate the current status of the foundation, but that no defects where found. Kruszewski denies that there was any structural defect known to him at the time of closing.

Sandra Goodman (hereinafter referred to as "Goodman") was Kruszewski's agent when he purchased the subject property from its previous owner, Dr. Meade Kendrick. After Kruszewski purchased the property, he and Goodman became engaged to be married. Upon a decision that both would sell their homes in order to purchase another, Goodman moved into the subject property and began efforts to sell it. In her answer, Goodman denies that she failed to disclose structural defects or that structural and foundation problems were fully disclosed to her. She avers that both she and Kruszewski complained to repair persons up until the date of closing that the problems had not been corrected. In Goodman's amended answer, she avers that the Pattons' damages were caused by the negligence of James Hoffer, National Home Insurance Company, and Dr. Meade Kendrick, and that the Pattons were negligent in failing to exercise reasonable care regarding the transaction forming the basis of their suit. The court granted motions by Goodman and Kruszewski for counter-claims and third-party complaints for specific performance to facilitate the perfection and joinder of the warranty claim against National Home Insurance Company.[3]

In his amended answer, Kruszewski avers that any damages were caused by the negligence of James Hoffer, Piling and Repairs, Inc., National Home Insurance Company, Carol Wood Lake Partners, Dr. Meade Kendrick, Randy Mayall, Peter Ritten, Klink and Associates, Inc., and Michael

_____

with the Pattons and that Goodman was not acting as an agent, servant, or employee of Coldwell Banker Germantown. The order dismissed Coldwell Banker Germantown from the suit and was made final pursuant to Tenn. R. Civ. P. 54.02. No appeal was taken.

[2] GMAC Mortgage was dismissed as a defendant by order entered May 22, 1995 and is not involved in this appeal.

[3] National Home Insurance sold Dr. Kendrick, the original owner, a transferable ten year 210 warranty policy, which transferred to Kruszewski and subsequently to the Pattons.

Saliba.

A non-jury trial was held December 17 and 18, 1997. Mr. Patton testified that he first visited the house with his agent, Mr. Mayall, and no one was home. He returned for a second visit with his wife, Mayall, and his mother and father-in-law, before making an offer. They could not get into the garage, because there were boxes stacked from the floor to the ceiling. Goodman was present at the second visit and told them that she was Kruszewski's fiancé and was living in the house. Mr. Patton testified that Goodman told them that more concrete had been poured into the foundation by the builder and that it was "no big deal." Mr. Patton testified that no cracks were evident on the house. He also testified that he had a mechanical inspection done by Arnold Cox, who made no report of cracks in the house. Patton believed that the mechanical inspection would include the entire property; however, it only covered mechanical appliances in the home. A disclosure form given to Mr. Patton by Kruszewski at the same time that he accepted the Pattons' offer, reads "[a]dditional concrete poured in the foundation." Before he purchased the house, Mr. Patton asked Mr. Kruszewski and the contractor about the cost of repairing a seam in the Dryvit but was not aware of any repairs needed for cracks. The Pattons purchased the house from Kruszewski for $150,500.00, and the closing was August 31, 1994.

Mr. Patton testified that Goodman would not let them into the house until the day that they moved in, around September 10, 1994. Patton testified that he first became aware of cracks on the day that they moved into the house, when he discovered a huge tear going into the kitchen from the garage. The Pattons discovered two more cracks while they were sitting on the back deck the same day. Patton testified that he learned from a neighbor that the house had "broken in half."

Patton testified that he interpreted the disclosure form to mean that if there were major problems with the foundation of the house that they would be disclosed, and because they were not advised of any structural problems, he saw no reason to hire a structural engineer to do an inspection. Patton stated that after they moved in and discovered cracks he hired a soil expert, Mr. Thompson, an engineer, Michael Saliba, and general contractors, Dirk Goldsmith and Kenneth Goodwin, to determine the extent of the problems with the house.

Dr. Meade Kendrick, who owned the house prior to Kruszewski, testified on the Pattons' behalf that he was the original owner of the house and that it was built for him by Greenfield Builders at a cost of $139,000.00. Within one year of moving into the house, Kendrick began to see cracks but was reassured by the builder that this was normal settling. Kendrick filed under his 210 warranty to have the home repaired. Kendrick testified that the warranty company hired Mr. Hoffer of Piling & Repairs in the summer of 1993 to fix the foundation, to relieve the settling, and to do cosmetic repairs. Mr. Hoffer repaired the foundation problems by pouring grout under about one half of the slab. In October of 1993, when Kendrick sold the house to Kruszewski for $149,000.00, Kruszewski was provided a disclosure statement regarding the repairs done due to settlement and the additional reinforcement provided.

Kruszewski testified that the only conversation he had with Mr. Hoffer concerning the warranty on the work done to the house was when he listed the house. Kruszewski claims to have

asked Mr. Hoffer about the warranty because it was about to expire. Kruszewski stated that Hoffer visited the house and met with Goodman and verified that the work that he had done was still fine, however Mr. Hoffer did not tell Kruszewsk that he had done work to only half of the property. Kruszewski testified that Hoffer never walked him around the house to show him the work that he had done. Kruszewski's testimony contradicts Mr. Patton's testimony that the garage was inaccessible when the Pattons looked at the house. Kruszewski states that there was a refrigerator in the garage that they used, and that he could walk through the garage when Goodman's things were stored there.

Goodman testified that she made Mayall aware that work had been done on the foundation in a telephone conversation before he brought Kruszewski an offer from the Pattons, and that she volunteered to give the Pattons the name of the man who did the work. Mayall said that was not necessary at the time, and Goodman never heard any more about it. Goodman further testified that she was unaware of any further problems with the house at the time of the Pattons' offer to purchase it and denies that Hoffer recommended to her that she should disclose cracks that he pointed out to her on his visit to the house just prior to the Pattons' offer.

James Hoffer, owner of Piling & Repairs, testified that he was hired by National Home Insurance, to repair the house in June and July of 1993. Hoffer did only the work that he was authorized to do, which included pressure grouting[4] half of the house and including the area under the master bedroom. Hoffer testified that he informed National Home Insurance that there was hairline cracking in other sections of the house, however, their engineer told him to grout only a portion of the house. Inside the house, Hoffer repaired cracks in the sheet rock and re-squared a door and a window in the master bedroom. The cost for the pressure grouting and replacing the back patio was $22,000.00.

Hoffer testified that after Kruszewski purchased the house, he called him to come out and look at cracks that he and Goodman had discovered. At the time that Hoffer visited the house it was for sale again. He was shown a crack in the sheet rock at the entrance from the garage to the kitchen, and one in the shower stall in the master bath. Hoffer testified that he explained to Kruszewski and Goodman that these cracks had never been repaired because they had not been specified by the warranty company, and that he repaired only what he was authorized to repair as designated by the engineer's report provided by National Home Insurance. Hoffer testified that none of the cracks that he repaired had reopened, but there were cracks on the side of the house where he did not grout. He also stated that Ms. Goodman told him that she would not reveal to purchasers that Hoffer only warranted the work he did and that there were cracks he did not repair.

---

[4] Hoffer explained pressure grouting as a process of driving an injection pipe through the soft soil until hitting a hard level of soil, then injecting cement grout at one foot intervals to the bottom of the footing. On this job, the grout injection pipes were installed about every four feet, and went from eight to thirteen feet deep below the foundation to stabilize the foundation. Eighty-eight yards of cement grout were injected under this house. Hoffer had also repaired the house next door to the property subject to this suit with the same grouting process.

David Thompson, a geotechnical engineer, was hired by Mr. Patton to do some geotechnical exploration at the house and make recommendations for repair. At trial Mr. Thompson testified that he recommended that grouting be done under a portion of the residence to stabilize the soft soils. Mr. Thompson further recommended to the Pattons that a slope stability study be done on the slope behind the house because there was some evidence of slope movement. Thompson testified that his bill to the Pattons for these services was $1,917.00. Thompson's testimony did not include an estimate of the cost to repair the house.

Michael Saliba, a consulting engineer, testified that he was hired by Mr. Patton to look at the property regarding the settlement problem and to suggest possible remedies and measures to prevent further damage. Saliba had inspected the property when Dr. Kendrick was the owner in 1992 and told Dr. Kendrick that there were repairs to be done. In his report to the Pattons, Saliba recommended more pressure grouting under the house, which could involve repairs to pipes and plumbing underneath the house and to the concrete floor and foundation. Repairs recommended by Saliba included work to windows, trim and finish, as some of the windows were inoperable. Saliba stated that his inspection revealed that the roof had been inadequately framed and had warped, consequently there would be roof repairs subsequent to the foundation repairs.

Saliba recommended that a soil stabilization report be done. He also recommended that a retaining wall be built on the back of the property to keep the soil from washing away and undermining the house. Although stating that the wall and the repairs would be expensive, Saliba gave no estimate of the cost involved. Saliba does testify that this repair work would take from two to three months, and that the house would not be inhabitable during the work. Saliba stated that he billed Mr. Patton $1,800.00 for his services.

Saliba further testified that he was aware that there had been discussion of tearing the house down as a solution, and stated "[p]ersonally, I thought that might be a good solution." Saliba testified that the problem with the house is not knowing what the cost of repairs would be and that the house may never be quite right.

Mr. Patton also hired Kenneth Goodwin, a contractor, to look at the house. Part of the reason for Mr. Goodwin's visit to the Pattons' house was to do an estimate on repairs, and although he could not remember his exact estimate, at trial stated that it would require somewhere close to 80% of the value of the house to do the necessary repairs. Exhibit No. 5, a list of the Pattons' expenses, reports Goodwin's fee in the amount of $500.00.

As to the value of the house, Mr. Collins, a principal with Coldwell Banker, testified that the multi-listings reflect that the Pattons put the house on the market in January of 1995 for $160,000.00. Mr. Collins testified that this does not necessary reflect the value of the house, only what the Pattons were asking.

At the conclusion of the proof, the chancellor ruled from the bench that the issue in this case was whether the sellers misrepresented or failed to disclose known defects in the house they were selling to plaintiff. The chancellor noted that the real fault for the foundation problems with the house lies elsewhere, with the builder, however the issues in this action involve misrepresentation,

non-disclosure, and their appropriate remedies. There was testimony about the need to repair the house and methods that were suggested to repair the house; however, the record is void of any real estimate of the cost of repair.[5]

The chancellor found "sharp conflict" in the testimony and stated that it was unusual for Goodman not to accommodate the Pattons by giving them access to the house after the closing for decorating purposes on the excuse that Goodman was too busy. The chancellor found that it was not unusual for a worker in Hoffer's position to only warrant the parts of the house that he repaired, and that Hoffer was working for the insurance company in making the repairs and answered only to them.

The chancellor found that Kruszewski failed to satisfactorily explain why he felt that it was necessary to call Hoffer back to the house to check the house simply because the warranty was about to expire. It seemed to the chancellor that Kruszewski must have been concerned that something was wrong. The chancellor concluded that Kruszewski either knew or suspected that there were additional problems.

The chancellor found that adequate disclosures were not made, and the Pattons were deceived into buying the house. The chancellor ruled that this was not a negligence case, and that comparative fault did not apply. He found that Kruszewski and Goodman acted in concert.

The chancellor found $150,000.00 in compensatory damages to the Pattons, the total value of the house. He also allowed an offset for any recoveries from the insurance carrier[6] and awarded no punitive damages. A final judgment was entered on August 28, 1998, against Kruszewski and Goodman, jointly and severally, in the amount of $90,000.00, reflecting the $150,000.00 damages, minus $60,000.00 that was paid to the Pattons from National Home Insurance, under the Pattons' warranty claim.[7]

Both Goodman and Kruszewski filed post-judgment motions to alter or amend judgment or in the alternative for a new trial with affidavits of defendants' counsel regarding a warranty deed executed August 26, 1998, whereby the Pattons sold the subject property for the sum of $100,000.00.

---

[5] In his closing argument at trial, counsel for the Pattons referred to the testimony of Dirk Goldsmith, a contractor contacted by the Pattons to estimate the cost of repair, who stated in his deposition that the estimated cost to fix the house was $132,000.00. However this deposition testimony is not included in the record and is therefore excluded from our review.

[6] At the time that the case was tried in December of 1997, National Home Insurance had made no final determinations as to the amount they would pay out on the warranty for repairs.

[7] The limits of the policy were $139,000.00 indicating that National Home Insurance estimated the repairs at $60,000.00, however, this is not substantiated in the record. The Pattons' counsel argued at the post-judgment motion hearing that this does not reflect the cost of the repairs, but is instead a settlement amount.

Motions were heard and denied October 13, 1998, and an order was entered October 27, 1998.

Both Kruszewski and Goodman appeal the judgment, and Kruszewski has filed a Rule 14 Tenn. R. App. P. motion with this Court for consideration of post-judgment facts which we have granted by an order entered December 2, 1999. In his brief, Kruszewski raises the following issues for review:

> I. Whether the court below erred in determining that the plaintiffs established their damages or their rescission theories of recovery?
>
> II. Whether the court below erred in denying appellants Motion to Alter or Amend or for New Trial?
>
> III. Whether the appellant, Goodman, due to her representative capacity owed a duty to appellant Kruszewski, such that any and all liability, if any, for the claims of plaintiff/appellees should be solely hers and not appellant, Kruszewski's.
>
> IV. Whether the court below should have adjusted fault among the parties and nonparties?

In addition to the above stated issues, Goodman also raises the following issue as stated in her brief:

> Whether the court erred in holding that defendants were liable due to a violation of the Tennessee Residential Disclosure Act?

We review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the finding, we must affirm, absent error of law. Tenn. R. App. P. 13 (d).

We begin by considering Goodman's issue of whether the trial court erred in holding that the defendants were liable due to a violation of the Tennessee Residential Disclosure Act. As to Kruszewski's liability as owner, T. C. A. § 66-5-202 (Supp. 1999) reads in pertinent part:

> **Required disclosures or disclaimers. –** With regard to transfers described in § 66-5-201, the owner of the residential property shall furnish to a purchaser one of the following:
> (1) A residential property disclosure statement in the form provided in this part regarding the condition of the property, including any material defects known to the owner. Such disclosure form may be as included in this part and must include items listed on the disclosure form required pursuant to this part. The disclosure form shall contain a notice to prospective purchasers and owners that the prospective purchaser and owner may wish to obtain professional advice or

-7-

inspection of the property. The disclosure form shall also contain a notice to purchasers that the information contained in the disclosure are the representations of the owner and are not the representations of the real estate licensee or sales person, if any. The owner shall not be required to undertake or provide any independent investigation or inspection of the property in order to make the disclosures required by this part;.....

As to requirements of a real estate agent, T.C.A. § 66-5-206 (Supp. 1999) reads:

**Duties of real estate licensees.–** A real estate licensee representing an owner of residential real property as the listing broker has a duty to inform each such owner represented by that licensee of the owner's rights and obligations under this part. A real estate licensee representing a purchaser of residential real property or, if the purchaser is not represented by a licensee, the real estate licensee representing an owner of residential real estate and dealing with the purchaser has a duty to inform each such purchaser of the purchaser's rights and obligations under this part. If a real estate licensee performs those duties, the licensee shall have no further duties to the parties to a residential real estate transaction under this part, and shall not be liable to any party to a residential real estate transaction for a violation of this part or for any failure to disclose any information regarding any real property subject to this part. However, a cause of action for damages or equitable remedies may be brought against a real estate licensee for intentionally misrepresenting or defrauding a purchaser. A real estate licensee will further be subject to a cause of action for damages or equitable relief for failing to disclose adverse facts of which the licensee has actual knowledge or notice. "Adverse facts" means conditions or occurrences generally recognized by competent licensees that significantly reduce the structural integrity of improvements to real property , or present a significant health risk to occupants of the property.

We agree with the chancellor's finding that there were "sharp conflicts in the testimony." Both Kruszewski and Goodman claim to know nothing of persisting problems with the foundation of the house. Kruszewski claims to have contacted Hoffer when he was trying to sell the subject property, only to inquire into whether the warranty could be extended. Goodman claims to have told Mayall that eighty-eight yards of grout had been poured under the house. She denies any statement to Hoffer indicating that she would not reveal to prospective purchasers the fact that Hoffer only warranted the work that he did, but there were cracks in the house that he had not repaired. Goodman testified that what she revealed on the disclosure form, in conjunction with what she told Mayall, was the sum of all she knew regarding any problems with the foundation of the house, and stated that she was unaware that any new problems had developed.

In *Hobbs v. Hobbs*, 987 S.W.2d 844 (Tenn. Ct. App. 1998) this Court stated that "[t]he findings of the trier of fact dependent upon the credibility of the witnesses should be accorded great weight by the appellate court." Citing *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959); *and Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982). We agree with the chancellor that both Kruszewski and Goodman were aware of a great deal more than they disclosed concerning the repairs. They knew that problems continued with the house. Regarding the disclosure sheet, the chancellor stated:

> Exhibit No. 3, as I have pointed out earlier, you know, this is a disclosure sheet. Now, this is not a question– just a question and answer document, but this is a form with which the seller is suppose to specifically advise the buyer of any known defect or problems or work that has been done on the house in the last six months, and it just clearly states that, or that have been repaired within the last six months.
>
> As I mentioned earlier, on the first page of this disclosure statement, item four, is the statement or question: Are you, the seller, aware of any known defects, malfunctions, in any of the following? And it's got a blank; yes or no. And nothing is checked there.
>
> Now, keep in mind that this is not just something that may be filled out. It is required that it be filled out. And it is not filled out. It does not indicate that there's anything wrong when you get to that point...
>
> So the exact people who are required to make these disclosures did not disclose them. Even though down below, they checked: Foundation, slab. And then in an explanation below that they point out that, was after the building was completed, there was concrete poured into the foundation.
>
> That doesn't describe a defect in this Court's view. It just makes a statement that's something that was done. You know, like well, the backyard was muddy, so they poured a concrete slab to keep the mud down.
>
> In other words, in the Court's view, coupled with the fact that there's a dispute about disclosure, the court simply feels that the sellers did not properly disclose what they knew about the problem with the house.
>
> I think, in this Court's view, at least, knowing that 88 cubic yards of concrete was pumped in, under, or around a house denotes monumental problems, and certainly should have been disclosed in detail. Now that's the way the Court would find it.
>
> At any rate, the Court feels that there was not an adequate disclosure and that the buyers were deceived into buying the house.

The evidence does not preponderate against the chancellor's findings regarding the disclosure

form.  We believe that both Goodman and  Kruszewski are liable under the Tennessee Residential Disclosure statute, specifically T.C.A. § § 66-5-206 and 66-5-202, respectively.  In so finding, we dispose of  Kruszewski's third issue on appeal.

In Kruszewski's fourth issue involving comparative negligence, we agree with the trial court that this was not a negligence action.

We now turn to  Kruszewski's first issue:  whether the trial court erred in determining that the plaintiffs established their damages or rescission theories of recovery.  In awarding damages, the chancellor stated:

> The problem, obviously from the testimony and the pictures, [the house] was much worse now that it was back before the repairs were made; although, this Court does not have enough to find that the repairs that were made were not done properly, to the extent that he worked on part of the house as far as the Court can tell – I'm not sure about this, the proof is not clear on it – but it would appear that he did a reasonably satisfactory job.
>
> But I think that under the circumstances and viewing the proof in total, that a judgment should be granted for the total value of the house, which has been testified to being $150,000.00.
>
> The Court will not add anything for the expenses. And further, if there are any recoveries from the insurance carrier, certainly, that would offset part of the award to the extent that the money has been received.

The complaint in this case alleges fraud and requests that the deed be declared null and void. The Pattons seek rescission, compensatory, and punitive damages, thereby seeking both contractual and tort remedies.

> An individual induced by fraud to enter into a contract may elect between two remedies.  He may treat the contract as voidable and **sue for the equitable remedy of rescission or** he may treat the contract as existing and **sue for damages at law under the theory of 'deceit.'**  The latter is grounded in tort.

*Vance v. Schulder,* 547 S.W.2d 927, 931 (Tenn. 1977). (Emphases added), *see also Gage v. Seaman,* No. 03A01-9711-CH-00503, 1999 WL 95185 at *6 (Tenn. Ct. App. Feb. 23, 1999 ).

The first alternative, rescission, involves setting aside or avoiding the transaction.  *Lamons v. Chamberlain*, 909 S.W. 2d 795, 800 (citing *Williamson v. Upchurch*, 768 S.W. 2d 265, 271 (Tenn Ct. App. 1988).  Rescission is an equitable remedy, and may be ordered by a court where a contract is induced by fraud or duress.  *Id.*  (Citing *Belote v. Henerson*, 45 Tenn. (5 Cold.) 471, 474 (1868) (duress); *Graham v. First American Nat'l Bank*, 594 S.W. 2d 723, 726 (Tenn. Ct. App.

-10-

1979) (fraud)). "It is intended to return the parties to the position they were in before the transaction took place." *Id.* (Citing *Lindsey-Davis Co. v. Siskin*, 210 Tenn. 339, 342-43, 358 S.W.2d 331, 333 (1962); *Lloyd v. Turner*, 602 S.W.2d 503, 510 (Tenn. Ct. App. 1980); *Alledge v. Ridge*, 12 Tenn. Ct. App. 415, 417-18 (1930)). Although rescission may have been available under the facts of this case at the time of trial, *see Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991), the chancellor did not order rescission of the contract. It appears that the chancellor awarded the amount properly for rescission, the price of the property, without completing the award by requiring the Pattons to return the property. Furthermore, that remedy is no longer available because, according to the affidavits of defendants' counsel, the Pattons sold the house subsequent to trial, but prior to final judgment, and are therefore unable to return the property.

In order to form the basis of the tort of fraudulent misrepresentation the alleged misrepresentation: (1) must have been a representation as to an existing fact; (2) must have been false; (3) must have been relied upon; and (4) must have been so material that it determined the conduct of the parties seeking relief. *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991); (citing *Dozier v. Hawthorne Development Co.,* 37 Tenn. App. 279, 262 S.W.2d 705, 709 (1953)).

The Chancellor found the Pattons to have been "deceived into buying the house" by appellants' failure to make adequate disclosures. The failure to make adequate disclosures is tantamount to fraudulent misrepresentation. *See Gray v. Boyle Inv. Co.* , 803 S.W.2d 678, 683 (Tenn Ct. App. 1990) (holding that a party may be held liable for damages caused by his failure to disclose material facts to the same degree that he may be liable for damages caused by fraudulent or negligent misrepresentation).

The Middle Section of the Tennessee Court of Appeals sets out damages available in an action for fraudulent misrepresentation in *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228 (Tenn. Ct. App. 1976), stating in pertinent part:

> This measure of damages allows the plaintiff to recover the difference between the actual value of the property he received *at the time of the making of the contract* and the value that the property would have possessed if Appleton's [agent for the defendant] representations had been true. 37 Am.Jur.2d, Fraud and Deceit, § 353, p. 473 (1968); see *Shwab v. Walters, supra;* 13 A.L.R.3d, Damages - Fraudulent Representation, § 3, p. 885 (1967). The application of this measure of damages compels the defendant to make good on the false representations. The measure of damages and the fixing of the value of the property are to be determined as of the time of the transaction. 37 Am.Jur.2d, § 365, p. 495 (1968); 13 A.L.R.3d, § § 2-3. pp. 882-902 (1967); McCormick on Damages, § 122, pp. 456-457 (1935).

*Id.* at 233 (Emphasis in the original).

-11-

In *Gage v. Seaman*, No. 03A01-9711-CH-00503, 1999 WL 95185 (Tenn. Ct. App. Feb. 23, 1999), this Court stated:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in a transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

*Gage,* at *6 (citing *Boling v. Tennessee State Bank,* 890 S.W.2d 32, 35 (Tenn. 1994) (quoting Restatement (Second) of Torts § 549 (1977)).

In *Gage, supra,* the plaintiffs brought an action for breach of contract and fraudulent misrepresentation against the sellers and the real estate company in connection with their purchase of a house that had a defective septic system. The trial court entered a judgment against the sellers without explaining how damages were calculated and dismissed the claims against the real estate company.[8] The trial court's finding that the sellers had actual knowledge of the defect at the time that the property was sold and nevertheless signed the disclosure statement was upheld on appeal. On appeal by the Gages, this Court instructed that the court below should have followed the formula set forth in the Restatement (Second) Torts, stating that "as to the difference in value, the Gages contracted to pay $105,000, but of course had not yet paid the full amount." The Gages were entitled to an award of $4,190.41[5] for the loss of their equity in the home and other pecuniary losses suffered as a consequence of the recipient's reliance on the misrepresentation. *Id*. The case was remanded for an itemization of the pecuniary losses and re-assessment of damages. *Id.*

In a case of fraud, the damages should compensate the injured parties by putting them back

---

[8] On appeal this Court found that real estate agents are required under Tennessee law to disclose known facts about the property that materially affect a sale of property. *Id.* at *4 (citing *Wyner v. Athens Utilities Bd.,* 821 S.W. 2d 597, 598-99 (Tenn. Ct. App. 1991)). And further found that a real estate agent has a duty to deal honestly with both buyers and sellers. *Id.* (Citing *Hughey v. Rainwater Partners,* 661 S.W. 2d 690, 691 (Tenn. Ct. App. 1983)). The agent in *Gage* had signed a disclosure statement as did Goodman, as the listing agent, however the Gages presented no proof that the agent in their case had actual knowledge of the problems with the septic system. This Court therefore found that evidence did not preponderate against the trial court's factual finding that a reasonable real estate agent would not have known of the problem from viewing the site and that the trial court appropriately dismissed the claims against the real estate company based on alleged knowledge of their agent. *Id.*

[5] The $4,190.41 figure represents the accumulated principal in the house, which this Court stated that the Gages were clearly entitled to since the house was uninhabitable.

in the position that they would have been in had there been no fraud. *Gage* at \*6 (citing *Harrogate Corp. v. Systems Sales Corp.,* 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995)). A party seeking to recover for fraud and/or misrepresentation must prove the misrepresentation as well as some loss or injury as a result of the misrepresentation. *Harrogate Corp.* 915 S.W. 2d at 817.

The plaintiffs in the instant case have proved misrepresentation and have presented evidence to prove a specific loss or injury. However, the award of the contract price of the property, $150,000.00, is not substantiated by the record.

The chancellor made no allowance for the value of the lot, nor is there any proof of cost of repair or cost of rebuilding the house in its entirety. We should note that the record does not contain any information concerning the payment made under the warranty on the house. The only information is that $60,000.00 was paid, but we do not know the basis of that, although we suspect that the insurance company paid an amount based upon an estimate of repairs. Conceivably, the repair costs could be a measure of damages as to the difference between the value of what was actually received and its purchase price, if the repairs put the property back into a condition as it was represented. Moreover, although the measure of damages requires proof of value as represented and value as received, the trial court, on motion to alter or amend, apparently did not consider the sale price of the property before entering the final decree as reflecting on the value. In the record before us, there is not sufficient evidence to make a determination as to the damages to be awarded to the plaintiff, and this is a proper case for remand to the trial court pursuant to T.C.A. § 27-3-128 (1980), which provides:

> **Remand for correction of record. –** The court shall also, in all cases, where, in its opinion, complete justice cannot be had by reason of some defect in the record, want of proper parties, or oversight without culpable negligence, remand the cause to the court below for further proceedings, with proper directions to effectuate the objects of the order, and upon such terms as may be deemed right.

Accordingly, the judgment of the trial court as to liability of the defendants, Kruszewski and Goodman, is affirmed, and that part of the judgment awarding damages is vacated. The case is remanded to the trial court for further proceedings to determine the proper amount of damages including any pecuniary loss in addition to damages resulting from the defective home. Costs of the appeal are assessed equally against Kruszewski and Goodman.