A. Cushman **ATKINS** and wife, Beresha Atkins, Plaintiffs/Appellants,

v.

E.F. **KIRKPATRICK** and wife, Janice Kirkpatrick and Barbara Parrish, Defendants/Appellees.

Court of Appeals of Tennessee, Western Section, at Nashville.

July 5, 1991.

Application for Permission to Appeal Denied by Supreme Court Dec. 2, 1991.

Jessica Dugger and Jere McCulloch, Lebanon, for plaintiffs/appellants.

Robert L. Callis, Mt. Juliet, for defendants/appellees E.F. Kirkpatrick and wife, Janice Kirkpatrick.

John Gwin, Mt. Juliet, for defendant/appellee Barbara Parrish.

TOMLIN, Presiding Judge (Western Section).

Plaintiffs, A. Cushman Atkins and wife, Beresha Atkins, (hereafter "Plaintiffs" or "Mr. Atkins" or "Mrs. Atkins") sued defendants, E.F. Kirkpatrick, his wife Janice

Kirkpatrick, and Barbara Parrish, their realtor, (hereafter "Defendants," "Mr. Kirkpatrick," Mrs. Kirkpatrick," or "Parrish," respectively), in the Chancery Court for Wilson County. Plaintiffs sought to rescind their purchase of a residential building lot, or in the alternative, damages. Plaintiffs sought relief on four alleged causes of action: fraudulent and negligent misrepresentation against the Kirkpatricks; negligent misrepresentation against the agent, Parrish; Parrish; mutual mistake; and failure of consideration. At the close of Plaintiffs' proof Chancellor Edward M. Turner granted Defendants' motion to dismiss all claims except that of mutual mistake, pursuant to Rule 41.02, T.R.C.P. Defendants rested the case without putting on any proof. The court found there had been a mutual mistake between the parties, but that the Plaintiffs had by virtue of the contract assumed the risk of loss.

On appeal Plaintiffs have raised four issues, although they can be stated grammatically as two: (1) whether the Chancellor erred in granting Defendants' motion to dismiss Plaintiffs' allegation of fraudulent and negligent misrepresentation by the Defendants Kirkpatrick, pursuant to Rule 41.02 T.R.C.P., negligent misrepresentation by the Defendants Kirkpatrick, negligent misrepresentation by the Kirkpatricks' agent Parrish, and failure of consideration; (2) whether the Chancellor erred in failing to rescind the contract upon the ground of mutual mistake between the parties. We resolve these issues in favor of the Defendants and affirm.

Before continuing with the opinion relative to the issues involved, this Court is compelled to address an ancillary issue presented by the Defendants. In their "Declaration of Record," which this Court perceives to mean "designation of the record," pursuant to Rule 24(g), T.R.A.P., Plaintiffs stated, "Plaintiffs-appellants sought the inclusion of all depositions and pre-trial briefs as provided by the above rule."

The clerk of the trial court thereupon included the pre-trial memorandum briefs filed by the parties, along with discovery depositions of the three named defendants. None of the three defendants testified at trial. Furthermore, their depositions were neither made trial exhibits nor read into the record by counsel for Plaintiffs.

In accordance with T.R.A.P., counsel for Defendants made a motion to delete the depositions from the record on appeal. Plaintiffs opposed the motion. A hearing was held before a newly-elected Chancellor who replaced Chancellor Turner. He held that inasmuch as his predecessor stated that he had "considered" the depositions, they should be included in the record to convey a fair and accurate record on appeal. Plaintiffs' contend in their reply brief that the phrase "Correction or Modification of the Record," to the effect that "the determination of the trial court is conclusive, absent extraordinary circumstances," found in Rule 24(e), T.R.A.P., precludes Defendants from again raising the issue before this Court. We respectfully disagree.

■ While we readily acknowledge that the issue of omissions from or improper inclusions in the record should be first raised in the trial court, in the event the trial court errs in its ruling, this Court has inherent power to correct that ruling. The Advisory Commission's comment to subdivision (e) of Rule 24 T.R.A.P. states in part that "omissions, improper conclusions and misstatements may be remedied at any time, either pursuant to stipulation of the parties or on the motion of a party or the motion of the trial or appellate court...."

■ As for trial briefs, there was no justification for either requesting or including these items in the record. This Court in *Aclin v. Speight*, 611 S.W.2d 54 (Tenn. App.1981) stated unequivocally that trial briefs and memoranda of authority of counsel have no place in the appellate record. In addition, the "general note" under the Advisory Commission's comments states: "Trial briefs are superfluous in view of appellate briefs, and they should not be sent to the appellate court absent unusual circumstances."

Without quoting the exact language or giving the circumstances under which the

statement was made, Plaintiffs stated in their brief that "the Chancellor specifically indicated that he had read and considered all depositions submitted in the case." In point of fact, the singular comment about the depositions made by Chancellor Turner took place at the very beginning of the trial, when, addressing Plaintiffs' counsel, he stated:

> All right, Ms. Dugger, any opening statements you would like to make. I did take the file, the exhibits, the depositions, and briefs last evening and read them, so I have some familiarity, but any statements you wish to make will be fine.

In considering a motion at the close of Plaintiffs' proof under Rule 41.02(2) T.R.C.P., the trial judge is called upon to impartially weigh and evaluate the evidence presented to him. In point of fact, these depositions were neither made exhibits nor introduced into evidence. Because the issues before this Court relate solely to questions concerning the adequacy or preponderance of the evidence presented to the Chancellor below when he granted Defendants' motion for dismissal, the depositions cannot be considered on appeal.

The depositions were filed with the Clerk and Master pursuant to local Rule 15, which reads in part:

> Rule 15. *Pretrial Procedure in Civil Cases*
>
> In all civil actions set for trial on the merits, at least 72 hours prior thereto:
>
> . . . .
>
> (c) Depositions to be used as evidence (other than for impeachment) shall be filed with the clerk.

Local Rule 16.01 also provides that "depositions submitted to the Court as evidence which are not read shall be made trial exhibits."

■ Notwithstanding the comment made by the Chancellor prior to opening statements, it is clear that these depositions in no way were considered by the previous Chancellor as evidence. In making his rulings from the bench, the Chancellor never alluded to these depositions. They should not be in this record.

A reading of the record presents the following facts: Plaintiffs were engaged in a search for a residential lot on which to build a home for themselves. While driving around the Mt. Juliet area, they saw the lot that later became the subject of this litigation. It was located next door to Defendants' house in a residential subdivision. Plaintiffs contacted Ms. Parrish, a local real estate agent employed by the realty company that had the lot listed for sale. The Plaintiffs met Ms. Parrish at the lot. Mr. Atkins testified that the lot was below road level and had a culvert that directed run-off water onto the lot. He also observed a drainage ditch near the back of the lot.

At this particular meeting Ms. Parrish advised the Plaintiffs that the ditch was to take care of any surface water run-off problems, and that up to that time it had functioned satisfactorily. She also advised Plaintiffs that the lot had been approved for building purposes by the local health department. She suggested they call the health department if they had any questions. Mr. Atkins testified that when the subject was introduced, he advised Ms. Parrish that he would have his brother, who was an environmentalist with the state of Tennessee, come out and render an opinion regarding the lot. Ms. Parrish and the Plaintiffs did not meet again until the closing.

It is uncontradicted that neither plaintiff met with Mr. or Mrs. Kirkpatrick at any time regarding the lot, nor did either of them have any conversations with the Kirkpatricks until the day of closing. At the sales closing a conversation between Mrs. Atkins and Mr. and Mrs. Kirkpatrick did not regard the lot itself.

Before contracting to buy the lot, Mr. Atkins telephoned the Wilson County Health Department and inquired about the Kirkpatrick lot. An employee at the health department advised him that a percolation test conducted in 1973 was on file, and unless the lot had been cut or filled, it was an approved building lot. Mr. Atkins conceded that he made no attempt to ascertain whether or not the lot had been cut or

filled since 1973, nor did he ask Ms. Parrish or Mr. and Mrs. Kirkpatrick about the possibility of any fill.

After Plaintiffs met with Ms. Parrish and before they signed the contract with the Kirkpatricks, Mr. Atkins visited the lot with his brother, James "Hugh" Atkins, the environmentalist. The brother viewed the lot from the road but never walked on it. He testified that his work involved the checking of lots, inspecting new construction, and evaluating subdivision plats. He further testified that he was familiar with the auger method utilized to test soil conditions, and that even though he did not conduct any test on the lot regarding soil conditions, he advised his brother to contact the local health department regarding such tests.

In August, 1987, the parties entered into a contract to purchase the lot for the sum of $12,000. The printed contract signed by the parties provided that the seller made no warranties and Mr. and Mrs. Atkins, as purchasers, took the premises in an "as is" condition. The paragraph read as follows:

It is expressly understood and agreed that this instrument contains the entire agreement between the parties and that, except as herein noted, there are no oral or collateral conditions, agreements, or representations, all such having been incorporated and resolved into this agreement. Unless otherwise specified herein, or new construction is involved, *this property is purchased "as is"* and neither Seller nor agent nor Broker(s) makes or implies any warranties as to the condition of the premises.

(Emphasis in original).

Following the transfer of title in September, 1987, Mr. Atkins kept the lot mowed and visited it numerous times. He never saw any water standing on it.

Plaintiffs began construction in October, 1988. The subcontractor employed by Plaintiffs began digging the footings on the premises with a backhoe. The common practice is to dig footings a reasonable depth through the top soil into firm natural soil and then fill the void with concrete. The subcontractor testified that he contin- ued to dig below the usual depth of slightly more than a foot but did not reach firm soil. He testified that in some areas he dug as deep as six or eight feet through fill material consisting of limbs, chips of concrete, brick, and the like. After the footings were dug, subterranean ground water began to seep into the holes, making it impossible to use them. The proof was clearly to the effect that the water filling up the trenches was ground water, not surface water. There was no testimony offered to establish either the source of the ground water or the fill.

Alan Rather, an environmentalist from Wilson County, was called to inspect the lot. He testified that there was nothing obviously wrong with the lot from a mere visual inspection of the surface. After observing the footings that had been dug Rather drilled several holes with an auger, discovering what he described to be fill material. He further testified that he did not know when the fill had been placed on the lot but that it could have been prior to 1973, when a percolation test was performed and the lot was approved by the county health department.

Construction work proceeded no further. This suit followed.

## I. FRAUDULENT MISREPRESENTATION, NEGLIGENT MISREPRESENTATION, AND FAILURE OF CONSIDERATION.

We note that at one point Plaintiffs alleged the contract should have been rescinded because there was "no mutual assent." While in opening statements to the court Plaintiffs' counsel referred to "lack of mutual assent" as an additional cause of action, this issue was not pled. Plaintiffs offered no proof as to lack of mutual assent, and the trial court did not rule on this alleged "issue." This Court will not rule on an issue raised for the first time on appeal. *Tops Bar-B-Q, Inc. v. Stringer*, 582 S.W.2d 756 (Tenn.App.1977).

The briefs refer several times to the motion made by Defendants following the close of Plaintiffs' proof as "a motion for a directed verdict." This is improper desig-

nation for a motion in a case tried without a jury. Rather, as already noted, the motion was actually one for dismissal under Rule 41.02(2).

■ If a motion to dismiss is made at the close of Plaintiffs' proof in a non-jury case, under T.R.C.P. Rule 41.02(2), the trial court must impartially weigh and evaluate the evidence just as though it were making findings of fact and conclusions of law after presentation of all the evidence. If the plaintiff's case has not been established by a preponderance of the evidence, the case should be dismissed if, on the facts found in the applicable law, plaintiff has shown no right to relief. *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734 (Tenn.1977).

■ Our scope of review is pursuant to Rule 13(d) T.R.A.P. The findings of the trial court in granting such a motion are accompanied by a presumption of correctness and, unless the preponderance of the evidence is otherwise, those findings must be affirmed. *College Grove Water Utility District v. Bellenfant*, 670 S.W.2d 229 (Tenn.App.1984).

### A. *Fraudulent Misrepresentation.*

■ Fraudulent misrepresentation can be a ground for the rescission of a contract. In order to form such a basis, the alleged misrepresentation: (1) must have been a representation as to an existing fact; (2) must have been false; (3) must have been relied upon; and (4) must have been so material that it determined the conduct of the parties seeking relief. *Dozier v. Hawthorne Development Co.*, 37 Tenn.App. 279, 262 S.W.2d 705, 709 (1953).

■ As for the Kirkpatricks, the proof is undisputed that they had no contacts with Plaintiffs prior to the closing. Even at that time there was no discussion between the parties as to the subject property and any problems.

■ As for the agent Ms. Parrish, she did advise Plaintiffs that the lot had been approved by the health department for a septic system and that it was a buildable lot. However, she cautioned them to contact the health department, which they did. After Plaintiffs received a qualified response from the health department that the property was approved so long as it had not been disturbed by cut or fill, they took no steps to investigate further. This issue is without merit.

### B. *Negligent Misrepresentation.*

■ The tort of negligent misrepresentation is recognized in this State. *See Hunt v. Walker*, 483 S.W.2d 732 (Tenn. App.1971). In *Merriman v. Smith*, 599 S.W.2d 548 (Tenn.App.1979), this Court stated that to prevail in a suit based on negligent misrepresentation the plaintiff must establish by a preponderance of the proof that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information. *Id.* at 556–57.

In the case before us, there is absolutely no evidence that either Ms. Parrish or the Kirkpatricks possessed knowledge of the defective condition of the property, nor that they were under a duty to make an inspection of the property. Plaintiffs never inquired whether the lot had been "disturbed." There was no proof that Plaintiffs relied upon the statements made by any of the defendants. To the contrary, Plaintiffs made their own independent investigation, including the utilization of Plaintiffs' brother, an environmentalist from an adjoining county. This issue is without merit.

### C. *Failure of Consideration.*

■ All contracts in writing signed by the party to be bound are *prima facie* evidence of consideration. T.C.A. § 47–50–103. The burden of overcoming the presumption of consideration in a validly executed contract is upon the party asserting lack of consideration. *Pinney v. Tarpley*, 686 S.W.2d 574 (Tenn.App.1984).

Plaintiffs alleged in their complaint that they had contracted to purchase an "ap-

proved and suitable building lot." The contract contained no specific provision to the effect that the lot was guaranteed to be a buildable lot. As we will note later, the contrary was true in that a disclaimer was clearly set forth in the contract. On its face the contract purports to sell real estate for money. Both are valid considerations for a contract. This issue is also without merit.

## II. MUTUAL MISTAKE

 Lastly, the Plaintiffs contend that the Chancellor erred in dismissing their suit against Defendants, inasmuch as there was a mutual mistake of material fact sufficient to defeat the purpose of the contract. The courts of this State have long held that rescission may be ordered on the ground of mutual innocent mistake. *See Wilson v. Mid–State Homes, Inc.*, 53 Tenn. App. 520, 530, 384 S.W.2d 459, 463 (1964); *Robinson v. Brooks*, 577 S.W.2d 207 (Tenn. App.1978).

The record clearly establishes that both Plaintiffs and Defendants were mistaken as to the suitability of the lot for use as a residential building lot, and Defendants offered no proof to the contrary. All parties were innocently mistaken as to the nature of the soil contained therein. Under such circumstances, it ordinarily would be incumbent upon the court to find rescission to be in order and to return the parties to their original positions.

 However, there is the matter of the contract. Absent fraud or mistake, a contract should be interpreted and enforced as written, even though it contains terms which may be thought of as harsh and unjust. *Taylor v. White Stores, Inc.*, 707 S.W.2d 514 (Tenn.App.1985). Defendants contended at trial and before this Court as well that the "as is" clause in the contract signed by the parties is an absolute defense to the claim of mutual mistake, and that the risk of loss should be allocated to Plaintiffs, pursuant to the intent of the parties.

 This appears to be a case of first impression in this state. However, the concept of allocating the risk of mistake is not new to our jurisprudence. The *Restatement (2d) of Contracts*, § 154, at 402 (1981), entitled "When a Party Bears the Risk of a Mistake," reads in part as follows: "A party bears the risk of mistake when (a) the risk is allocated to him by agreement of the parties...."

The real estate sales contract signed by Plaintiffs and the Kirkpatricks contained the following language which constitutes an "as is" agreement:

> Unless otherwise specified herein ... *this property is purchased "as is"* and Seller nor agent nor Broker(s) makes or implies any warranties as to the condition of the premises.

In *Lenawee County Board of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982), the Michigan Supreme Court addressed a case of clear mutual mistake in connection with the sale and purchase of an apartment with a septic tank system that proved to be defective. The sales contract had an "as is" clause in the agreement. While finding mutual mistake, the court denied rescission, stating:

> In cases of mistake by two equally innocent parties, we are required, in the exercise of our equitable powers, to determine which blameless party should assume the loss resulting from this misapprehension they shared. Normally that can only be done by drawing upon our "own notions of what is reasonable and just under all the surrounding circumstances."
>
> Equity suggests that, in this case, the risk should be allocated to the purchasers. We are guided to that conclusion, in part, by the standards announced in § 154 of the Restatement of Contracts 2d, for determining when a party bears the risk of mistake.... Section 154(a) suggests that the court should look first to whether the parties have agreed to the allocation of risk between themselves. While there is no express assumption in the contract by either party of the risk of the property becoming uninhabitable, there was indeed some agreed allocation of the risk to the vendees by the incorpo-

ration of an "as is" clause into the contract which ... provided:

"Purchaser has examined this property and agrees to accept same in its present condition. There are no other or additional written or oral understandings."

*Id.* at 31–32, 331 N.W.2d at 210 (footnotes omitted).

The court concluded that:

If the "as is" clause is to have any meaning at all, it must be interpreted to refer to those defects which were unknown at the time that the contract was executed. Thus, the parties themselves assigned the risk of loss to [the purchasers].

*Id.* at 32, 331 N.W.2d at 211. *See also Dingeman v. Reffitt,* 152 Mich.App. 350, 393 N.W.2d 632, 635 (1986); *Maloney v. Sargisson,* 18 Mass.App. 341, 465 N.E.2d 296, 299–300 (1984).

In the case under consideration, the "as is" clause in the contract between the parties clearly allocated the burden of loss on the purchasers—Mr. and Mrs. Atkins. Inasmuch as there is no ambiguity in this contract, it is the duty of this Court to apply the words used in the ordinary meaning, and none of the parties is to be favored in their construction. *Ballard v. North American Life and Casualty Co.,* 667 S.W.2d 79 (Tenn.App.1983). Clearly, the parties themselves assigned the risk of loss to Plaintiffs.

The decree of the Chancellor is affirmed. Costs on appeal are taxed to Plaintiffs, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.