# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 27, 2016 Session

### RICHARD W. GIBBS ET AL. V. CLINT GILLELAND ET AL.

**Appeal from the Circuit Court for Rutherford County**
**No. 66580     Ben H. Cantrell, Senior Judge**

_____

**No. M2015-00911-COA-R3-CV – Filed February 29, 2016**

_____

Buyers of unimproved real property seek rescission of a Lot/Land Purchase and Sale Agreement on the ground of mutual mistake. Buyers purchased the property for the purpose of constructing a house. It is undisputed that at the time of contracting, Buyers and Sellers believed the property was suitable for that purpose. One week after obtaining the necessary building permits and commencement of construction, Buyers were informed by the county that the property was substantially below the required Base Flood Elevation ("BFE") and that construction must cease immediately. Buyers halted construction and hired a professional engineer to address the issue. Based on unique drainage and flooding concerns, the engineer concluded that the property was not suitable for construction of a residential building and it had not been suitable for such purpose since the land was subdivided in 1999. After Buyers sued for rescission of the contract, both parties filed motions for summary judgment. The trial court found that when the contract was entered into the property was suitable for construction of a house and it only became unsuitable due to the subsequent action of the county in setting the BFE. Therefore, the court concluded there was no mutual mistake of fact. Based on this finding the court granted Sellers's motion for summary judgment and summarily dismissed the complaint. Buyers appeal. We conclude that, at the time of contracting, the parties were operating under a mutual mistake as to a contemporaneously verifiable fact; nevertheless, the contract assigned the risk of mistake to Buyers. Therefore, rescission on the ground of mutual mistake is not available. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

L. Gilbert Anglin, Murfreesboro, Tennessee, for the appellants, Richard W. Gibbs and Kathryn S. Gibbs.

Radford H. Dimmick, Nashville, Tennessee, for the appellees, Clint Gilleland and Kim Gilleland.

## OPINION

In 2012, Richard and Kathryn Gibbs ("Buyers") were looking for a lot in Rutherford County, Tennessee, on which they wished to build a house for their residence. With the assistance of their real estate agent, Diana Collier, Buyers looked at a parcel of unimproved property that was available for sale. At Buyers' request, the agent for Clint and Kim Gilleland ("Sellers") provided Buyers with a Property Disclosure Statement, outlining the conditions of the real property known to Sellers. On this statement, Sellers marked "Yes" in response to the question, "Are you aware of any past or present drainage or flooding problems [on the property]?" Because of this disclosure, Ms. Collier contacted Sellers' real estate agent to inquire further as to the nature of the drainage and flooding issues with the property. Sellers responded stating that they marked "Yes" because they were aware the property had flooded during the massive storm of May 2010, which affected many properties in Middle Tennessee.

Buyers then hired Mike Parker, a general contractor and builder, to visit the property and assess whether there was any flooding or drainage problems with the lot that could impede Buyers' ability to build a house on the lot. Mr. Parker inspected the property and reviewed the Federal Emergency Management Agency ("FEMA") flood panel and Flood Insurance Rate Map ("FIRM")[1], after which he determined that there were no flooding or drainage problems that would hinder Buyers' ability to construct a house on the lot.

Thereafter, Buyers executed a Lot/Land Purchase and Sale Agreement whereby they agreed to purchase the lot for $96,000. Importantly for purposes of this appeal, the contract contained two distinct rights of inspection of the property. One appears in Section 6 and the other appears in Section 7 of the contract.

---

[1] FEMA is the federal agency that implements the National Flood Insurance Program ("NFIP"), a federal program that enables property owners in participating communities to purchase insurance protection, administered by the government, against losses from flooding. *See* Jennifer Wriggins, *Flood Money: The Challenge of U.S. Flood Insurance Reform in a Warming World*, 119 PENN ST. L. REV. 361, 373-76 (2014). In order to participate in the NFIP, communities are required to adopt and enforce floodplain management ordinances to reduce future flood damage. *Id.* at 381. Through this program FEMA has created maps, known as FIRMs, which delineate the boundaries within a community of flood hazard areas. Sarah Fox, *This is Adaption: The Elimination of Subsidies Under the National Flood Insurance Program*, 39 COLUM. J. ENVTL. L. 205, 215 (2014). The FIRMs are divided into insurance risk zones according to the likelihood of a flood occurring within a particular region. *Id.* The record indicates that, at the time of Mr. Parker's inspection, the lot was in flood zone "X" under the community's FIRM; a designation reserved for low-risk flooding areas.

Section 6 of the contract made the agreement contingent upon Buyer's inspection of the property. Specifically, Section 6 provides:

> **6. Inspections and other requirements made a part of this Agreement.**
> [B]uyer . . . shall have the right and responsibility to enter the property during normal business hours for the purpose of making inspections and/or tests. . . . Buyer shall make such inspections as indicated in this paragraph and either accept the property in its present condition by written notice to Seller or terminate the Agreement as provided for each section marked below.
> **[Select any or all of the following stipulations. Unselected items are not a part of this Agreement.]**

Immediately below this paragraph appeared seven "stipulations" that were available for selection by "checking" the box immediately preceding the stipulation. As noted in Section 6, any stipulations that were selected were made a part of the agreement. Conversely, as the contract expressly stated, "[u]nselected items are not a part of this Agreement." Only two of the seven stipulations were selected; the other five remained "unselected." The two stipulations selected by Buyers, that being subsection B., entitled "Building Permit," and subsection C., entitled "Permit for Sanitary Septic Disposal System," gave Buyers the option to withdraw from the contract if: (1) they were unable to acquire the necessary licenses and permits to make specific improvements on the Property and notified Sellers of this fact within thirty days of the date of contracting; or (2) they were unable to obtain a permit for sanitary septic disposal from the respective governmental authority and notified Sellers of this within 30 days of the date of contracting.[2]

The other five available stipulations were not selected; thus, they were not made part of the agreement. One of the "stipulations" that was not selected reads as follows:

> **G. No Inspection Contingencies.** Buyer accepts the Property in its present condition. All parties acknowledge and agree that the Property is being sold 'AS IS' with any and all faults.

By not selecting this stipulation, the "AS IS" provision in Section 6 was not made a part of the agreement. Therefore, Buyers did not accept the property in the condition as of the date the contract was executed.

---

[2] The contract provided that if Buyers failed to provide proper notice, these contingencies would be deemed waived. Also, Buyers added several additional stipulations in Section 14 of the contract which made the agreement contingent upon: (1) Sellers having the corners of the lot staked and the soil site identified; (2) Buyers' ability to pull a septic permit for the property; and (3) Buyers' ability to have current drainage through the middle of the lot re-directed to the perimeter.

Conversely, Section 7 of the contract addressed Buyers' right to a final inspection prior to closing to confirm that the property was in the same or better condition as it was when the contract was executed and, significantly, whether closing constituted acceptance of the property in its condition as of the time of closing. This section reads:

> **7. Final Inspection.** Buyer and/or his inspectors/representatives shall have the right to conduct a final inspection of the Property . . . prior to Closing Date only to confirm Property is in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and to determine that all repairs/replacements have been completed. Property shall remain in such condition until the Closing Date at Seller's Expense. Closing of this sale constitutes acceptance of Property in its condition as of the time of Closing, unless otherwise noted in writing.

Buyers inspected the property prior to closing and did not exercise any of their rights under any of the contractual contingencies. On April 20, 2012, the parties closed on the sale and the lot was conveyed to Buyers by warranty deed.

Over the next ten months, Mr. Parker, the contractor retained by Buyers, developed building and site plans for the property. In February 2013, Mr. Parker obtained a Zoning Compliance Certificate from the Rutherford County Regional Planning Commission and a building permit from the Rutherford County Building and Codes Department and began construction of the Buyers' new home on the property.

One week after construction commenced, Mr. Parker was informed by the Rutherford County Building and Codes Department that the property was considered in an area of localized high water and aerial flooding and that the county had established a Base Flood Elevation ("BFE") for the property, and that Buyers' property was substantially below the required BFE.[3] Mr. Parker immediately stopped construction and notified Buyers of this development.

Buyers then hired a professional engineer, Robert Warren, to assess the ramifications of the county's BFE determination. Following an extensive study, Mr. Warren concluded that the property generally lies at a lower elevation than the

---

[3] A BFE is the computed elevation to which floodwater is anticipated to rise during a "base flood" (a flood having a one percent chance of being equaled or exceeded in any given year) and is the regulatory requirement for the elevation or flood proofing of structures. Beth Davidson, *How Quickly We Forget: The National Flood Insurance Program and Floodplain Development in Missouri*, 19 WASH. U. J.L. & POL'Y 365, 372 n. 48 (2005). The BFE for the property in this case was set at 606.0 feet, which required a minimum pad elevation of 607.0 feet and a finished floor elevation of 609.0 feet. The property's current elevation is approximately 599.00 feet.

surrounding lots and often receives surface and subsurface rainwater runoff from the adjacent lots.[4] Mr. Warren determined that the BFE set by Rutherford County was consistent with industry standards given the property's drainage issues. He further determined that the lot would need extensive modifications to comply with the BFE and to prevent flooding; however, these modifications would be extremely costly and may subject the Buyers to future liability due to the displacement of water onto neighboring parcels.[5] Given the unique challenges of this particular parcel, Mr. Warren determined the lot had not been suitable for residential construction since the neighborhood was subdivided in 1999 and it would not be suitable now, even if the county waived the BFE requirement. As a result, Buyers abandoned the thought of constructing a house on the lot.

On June 13, 2013, Buyers commenced this action against Sellers, seeking rescission of the contract on the grounds of mutual mistake.[6] Buyers contended that at the time of contracting both parties were of the belief that the property was suitable for constructing a residence, but the building requirements imposed by the county essentially rendered this use impossible. Alternatively, Buyers sought monetary damages from Sellers based on the theories of intentional misrepresentation, negligent misrepresentation, and breach of warranty.

Sellers filed an answer in which they denied that a mutual mistake of fact existed and asserted the affirmative defense of comparative fault. Sellers alleged that Buyers

---

[4] Because of the lower elevation, Mr. Warren stated that during a "two year" storm event – a storm that produces around 2.5 inches of rain in twenty-four hours and has a fifty percent (50%) probability of occurring in any given year – the property could be expected to flood to a depth of approximately two feet. He further stated that during a storm like the one that occurred in May of 2010, which has a .05% probability of occurring in any given year, the property could be expected to flood to a depth of approximately eight feet.

[5] Mr. Warren stated that the only possibility for remedying the property's flooding issues is to raise the building pad and footing by approximately nine feet. However, the engineer expressed concern with this option because for every cubic foot of fill needed to raise the property's elevation, there would be an equal displacement of water onto neighboring properties, which increases the flood water elevations on adjoining sites in violation of Rutherford County ordinance.

[6] The Rutherford County Planning and Engineering Department, and the Rutherford County Regional Planning commission were also named as defendants in the initial complaint; however, the claims against these defendants were dismissed on a Rule 12 motion. The trial court held that the claims against the governmental entities were barred under the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-205, and directed entry of final judgment as to the county pursuant to Tenn. R. Civ. P. 54.02. Buyers appealed this decision arguing that the county did not have immunity under the GTLA because the county's failure to timely notify them of the BFE constituted the negligent performance of an operational duty, not a discretionary duty. We affirmed the dismissal of the action against the Rutherford county defendants on the ground of governmental immunity in a prior appeal. *See Gibbs v. Gilleland*, No. M2014-00275-COA-R3-CV, 2014 WL 3954873 (Tenn. Ct. App. Aug. 13, 2014).

were more than forty-nine percent (49%) at fault for their own injuries as they had the opportunity to fully investigate any potential flood or drainage issues prior to contracting. Sellers also alleged that Ms. Collier and Mr. Parker were at fault by failing to take proper measures to investigate the potential drainage issues disclosed by Sellers. Thereafter, Buyers amended their complaint adding Ms. Collier, Mr. Parker, and Laurel Brooks Homes, Inc. (Mr. Parker's construction company) as defendants; however, these defendants subsequently filed motions for summary judgment which were granted by the trial court.[7]

Buyers and Sellers then each filed their own motions for summary judgment. Sellers asserted that there was not a mutual mistake of fact entitling Buyers to rescind the agreement because there was no mistake, and even if there was a mistake, Buyers assumed the risk of mistake by entering into an "as is" contract. Sellers also asserted that, under the facts, the claims of intentional misrepresentation, negligent misrepresentation, and breach of warranty could not be sustained as a matter of law.

Conversely, Buyers argued in their motion that a mutual mistake of fact existed because they had contracted with Sellers to purchase a lot for the purpose of building a house, Sellers were aware that was why Buyers were purchasing the lot and thought the lot could be used for that purpose, and the lot cannot be used for that intended purpose. However, in their response to Sellers' motion, Buyers conceded that the evidence adduced does not support a finding that Sellers intentionally or negligently misrepresented the past or present drainage issues with the lot.

Following a hearing on these motions, the trial court granted Sellers' motion for summary judgment and denied Buyers' motion. The trial court found that at the time of the contract, the lot was, as far as could be discovered, suitable for residence and only became unsuitable by the subsequent action of the Rutherford County Engineering and Codes Department; therefore, the court held there was no mutual mistake of fact by the parties that would entitle Buyers to a rescission of the contract. The court also dismissed Sellers' additional claims for intentional misrepresentation, negligent misrepresentation, and breach of warranty, given that counsel for Buyers had stipulated that Buyers could not sustain a cause of action on these grounds.

---

[7] With respect to Mr. Parker and Laurel Brook Homes, the trial court found that Mr. Parker was the president of Laurel Brook Homes and at all times was acting as their agent; Mr. Parker did not have any prior knowledge that the subject lot had ever flooded previously other than the flood of May 2010; his actions in obtaining the zoning compliance and building permits were in conformity with the standard of care of residential builders; it was not until after Mr. Parker obtained the zoning compliance and building permits that he was informed that the county had implemented a BFE; and Mr. Parker immediately notified the Buyers of this new code requirement. Based on these undisputed facts, the trial court found that Buyers do not have a claim against Mr. Parker or Laurel Brook Homes as a matter of law. As for Ms. Collier, her motion for summary judgment was unopposed by Buyers; thus, the trial court entered an order dismissing the claims against her with prejudice.

Thereafter, Sellers filed a motion for an award of attorney fees based on Section 10 of the contract. That provision reads as follows:

> **10. Default**. Should Buyer default hereunder, the Earnest Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific performance of the Agreement, or both. Should Seller default, Buyer's Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees.

Buyers filed a response asserting that the contract did not provide for such an award based on the fact Buyers sought to set aside the agreement, not to enforce it, and that they did not default on the agreement. Following a hearing, the trial court held that Sellers were entitled to an award of attorney's fees and costs in the amount of $10,071.38.

Buyers initiated this appeal and raise the following issues: (1) whether the trial court erred by finding that there was no mutual mistake and thus granting Sellers' motion for summary judgment; (2) whether Sellers met their burden of proof in order to sustain a motion for summary judgment; (3) whether the trial court erred by denying Buyers' motion for summary judgment; and (4) whether the trial court erred by finding that the Sellers were entitled to an award of attorney fees pursuant to the terms of the contract.

## ANALYSIS

### I. STANDARD OF REVIEW

This case involves an appeal from the trial court's grant of Sellers' motion for summary judgment. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Rye v. Women's Care Center of Memphis, MPLLC*, No. W2013-00804-SC-R11-CV, __ S.W.3d __, 2015 WL 6457768, at *12 (Tenn. Oct. 26, 2015). In doing so, we make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.* (citing *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013)).

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04; *see also Martin v. Norfolk S. Ry. Co*., 271 S.W.3d 76, 83 (Tenn. 2008). The party moving for summary judgment bears the burden of demonstrating both that no genuine dispute of material facts exists and that it is entitled to a judgment as a matter of law. *Martin*, 271 S.W.3d at 83.

When the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either: (1) by affirmatively negating an essential element of the nonmoving party's claim; or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Rye*, 2015 WL 6457768, at \*22.

A moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. *Id*. Rather, Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Rye*, 2015 WL 6457768, at \*22 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. *Id*. Summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial. *Id*. (citing Tenn. R. Civ. P. 56.04 & 56.06). The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial. *Id*. We now turn our attention to applying these standards in this appeal.

## II. MUTUAL MISTAKE

Buyers argue that the trial court erred by finding that there was no mutual mistake entitling them to rescission of their land sales contract, by granting Seller's motion for summary judgment, and by denying their motion for summary judgment.

Courts are to interpret contracts as they are written and we are not at liberty to make a new contract for parties who have spoken for themselves. *Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006) (citations omitted). Accordingly, we do not concern ourselves with the wisdom or folly of a contract, and we will not relieve parties from contractual obligations simply because they later prove to be burdensome or unwise. *Id*. Nevertheless, the policy favoring the enforcement of contracts as written must occasionally give way and it is well settled that courts have the power to alter the terms of a written contract where, at the time it was executed, both parties were operating under a mutual mistake of fact or law regarding a basic assumption underlying the bargain. *Id*.

> A "mistake" is an act that would not have been done, or an omission that would not have occurred, but for ignorance, forgetfulness, inadvertence, mental incompetence, surprise, misplaced confidence, or imposition. *State ex rel. Mathes v. Gilbreath*, 17 Beeler 498, 181 S.W.2d 755, 757 (Tenn. 1944); *Williams*, 3 S.W.3d at 509-510. A mistake must relate to a past or present fact, not an opinion as to the future result of a known fact. *Collier v. Walls*, 51 Tenn. App. 467, 495, 369 S.W.2d 747, 760 (1962) (citing *Metro. Life Ins. Co. v. Humphrey*, 167 Tenn. 421, 426, 70 S.W.2d 361, 362 (1934)). "In mistake cases, a 'fact' is something that can be contemporaneously verified, i.e., independently and objectively established at the time of contracting." 21 Steven W. Feldman, *Tenn. Practice Series— Contract Law and Practice* § 6:45 (2006). Some examples of "material and vital" mistakes include mistakes as to the existence of title, location of boundaries, quantities and conditions of land being sold. *Harris v. Spencer*, Williamson Ch. No. 21628, 1995 WL 413391, at *3 (Tenn. Ct. App. July 14, 1995) (citing *Isaacs v.. Bokor*, 566 S.W.2d 532, 541 (Tenn. 1978); *Wilson v. Mid-State Homes, Inc*., 384 S.W.2d 459 (Tenn. Ct. App. 1964); *Robinson v. Brooks*, 577 S.W.2d 207, 209 (Tenn. Ct. App. 1978)).

*Hunt v. Twisdale*, No. M2006-01870-COA-R3-CV, 2007 WL 2827051, at *7 (Tenn. Ct. App. Sept. 28, 2007).

A "mistake" exists in a legal sense when a person, acting on an erroneous conviction of law or fact, executes an instrument that he or she would not have executed but for the erroneous conviction. *Pugh's Lawn Landscape Co., Inc. v. Jaycon Dev. Corp*., 320 S.W.3d 252, 261 (Tenn. 2010). "A court may not rescind a contract for mistake unless the mistake is innocent, mutual, and material to the transaction and unless the complainant shows an injury." *Id*. (citing *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc*., 102 S.W.3d 621, 632 (Tenn. Ct. App. 2002) (quoting *Robinson v. Brooks*, 577 S.W.2d 207, 209 (Tenn. Ct. App. 1978)). In order for relief to be granted on the grounds of mistake, the mistake must have been: (1) mutual or fraudulent; (2) material to the transaction; (3) not due to the complainant's negligence; and (4) the complainant must

show injury. *Robinson*, 577 S.W.2d at 209 (citing 17A C.J.S. *Contracts* § 418(2) (1978)); *Wilson v. Mid-State Homes, Inc.*, 384 S.W.2d 459 (1964)).

In this case, Buyers purchased the property at issue for the purpose of constructing a house for their residence. It is undisputed that at the time the parties entered into the Lot/Land Purchase and Sale Agreement both parties believed the property to be suitable for such a purpose. The parties now agree that the lot cannot be used for constructing a residence.

The trial court found that at the time of the contract, the lot was, as far as could be discovered, suitable for a residence and that it only became unsuitable action of the Rutherford County officials in setting a BFE for the property. Accordingly, the trial court concluded that the parties' mutual mistake did not relate to a fact that could be contemporaneously verified at the time of contracting; therefore, the court declined to rescind the contract and granted Sellers' motion for summary judgment.

In support of their motion, Buyers presented an affidavit by Robert Warren, a licensed engineer, in which Mr. Warren details his study of the property and concludes that, given the property's elevation and drainage issues, the lot has not been suitable as a building residence since it was subdivided in 1999. Mr. Warren states that, although the county's BFE is consistent with industry standards, his opinion as to the suitability of the lot for residential construction would not change regardless of whether the county agreed to waive the BFE requirement. These conclusions were also included in Buyers' statement of material facts filed in support of their motion for summary judgment.

A careful review of the motions for summary judgment and responses indicates that material facts set forth by the engineer, Mr. Warren, are not in dispute. Specifically, there is no evidence to dispute his determination that had either party hired a professional engineer to perform drainage studies prior to entering into the contract, they would have known that the lot could not be used for the construction of a residential building and that the lot was unsuitable for construction of a house prior to the county's BFE determination. Thus, it is undisputed that both Buyers and Sellers were mutually mistaken concerning a fact that was both material to the transaction and which was contemporaneously verifiable at the time of contracting.

As noted earlier, proof that the parties were mutually mistaken concerning a material fact that was contemporaneously verifiable at the time of contracting is a ground for rescinding a contract; however, Sellers insist that a contractual provision renders this fact immaterial.

Rescission of a contract on the basis of mutual mistake is not available when the contract at issue allocates the risk of the mistake to the party seeking rescission. *See Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991); *see also Dairyland Power Co-op v. U.S.*, 16 F.3d 1197, 1203 (Fed. Cir. 1994). For example, in *Atkins v. Kirkpatrick*, this court found that the parties were mutually mistaken about the suitability of a lot for a residential building site; nevertheless, we affirmed the trial court's denial of rescission of the contract on the grounds of mutual mistake because the parties' real estate sales contract allocated the risk of loss to the buyer. *Atkins*, 823 S.W.2d at 553. We reasoned as follows:

> Absent fraud or mistake, a contract should be interpreted and enforced as written, even though it contains terms which may be thought of as harsh and unjust. *Taylor v. White Stores, Inc.*, 707 S.W.2d 514 (Tenn. App. 1985). Defendants contended at trial and before this Court as well that the "as is" clause in the contract signed by the parties is an absolute defense to the claim of mutual mistake, and that the risk of loss should be allocated to Plaintiffs, pursuant to the intent of the parties.
>
> This appears to be a case of first impression in this state. However, the concept of allocating the risk of mistake is not new to our jurisprudence. The *Restatement (2d) of Contracts*, § 154, at 402 (1981), entitled "When a Party Bears the Risk of Mistake," reads in part as follows: "A party bears the risk of mistake when (a) the risk is allocated to him by agreement of the parties . . . ."
>
> The real estate sales contract signed by [the parties] contained the following language which constitutes an "as is" agreement:
>
>> Unless otherwise specified herein . . . *this property is purchased "as is"* and Seller nor agent nor Broker(s) makes or implies any warranties as to the condition of the premises.
>
> In *Lenawee County Board of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982), the Michigan Supreme Court addressed a case of clear mutual mistake in connection with the sale and purchase of an apartment with a septic tank system that proved to be defective. The sales contract had an "as is" clause in the agreement. While finding mutual mistake, the court denied rescission, stating:
>
>> In cases of mistake by two equally innocent parties, we are required, in the exercise of our equitable powers, to determine

which blameless party should assume the loss resulting from this misapprehension they shared. Normally that can only be done by drawing upon our "own notions of what is reasonable and just under all the surrounding circumstances."

Equity suggests that, in this case, the risk should be allocated to the purchasers. We are guided to that conclusion, in part, by the standards announced in § 154 of the Restatement of Contracts 2d . . . [which] suggests that the court should look first to whether the parties have agreed to the allocation of the risk [of mistake] between themselves. While there is no express assumption in the contract by either party of the risk of the property becoming uninhabitable, there was indeed some agreed allocation of the risk to the vendees by the incorporation of an "as is" clause into the contract which . . . provided:

> "Purchaser has examined this property and agrees to accept same in its present condition. There are no other or additional written or oral understandings."

> . . .

> If the "as is" clause is to have any meaning at all, it must be interpreted to refer to those defects which were unknown at the time the contract was executed. Thus, the parties themselves assigned the risk of loss to [the purchasers].

*Id.* at 32, 331 N.W.2d at 211.

*Atkins*, 823 S.W.2d at 553-54. Accordingly, in *Atkins* we held that the "as is" clause in the parties' contract allocated the burden of loss to the purchasers; thus, rescission on the grounds of mutual mistake was not available. *Id.* at 554.

Here, Sellers rely on Section 7 of the contract to support their argument that the contract allocated the risk of mistake to Buyers.[8] As discussed above, Section 7 provides that "[c]losing of this sale constitutes acceptance of the property *in its condition as of the time of closing*, unless otherwise noted in writing." (Emphasis added). On the other hand,

---

[8] Sellers also rely on the Property Disclosure Statement which provides: "I understand that . . . the Property is being sold in its present condition only, without warranties or guarantees of any kind by Seller or Broker." However, because this document was not part of the sales contract and is not, in and of itself, a contract, we have determined that it is insufficient to shift the risk of mistake to Buyers.

Buyers argue that Section 6 of the contract prevents the agreement from being considered an "as is" contract because Buyers did not select the provision within Section 6 entitled "No Inspection Contingencies," which that states: "Buyer accepts the Property in its present condition." We have determined that Sellers have the better argument on this issue.

We are mindful of the fact the parties did not select the "AS IS" provision in Section 6; however, that fact is not relevant or material to the present issue. Section 6 pertains to the condition of the property at the time of *contracting*. By leaving the "AS IS" stipulation unselected and selecting two other provisions, Buyers reserved the right to inspect conditions of the property and to either accept the property in that state or terminate the contract prior to closing.

Section 7, however, addresses an entirely different circumstance, one that controls in the event the parties decline to exercise their inspection contingencies and "close" on the contract. In that event, Section 7 provides that the property is accepted "*in its condition as of the time of closing*, unless otherwise noted in writing." There was no contradictory writing in the contract here; thus, Section 7 unambiguously shifts the risk of fault concerning the condition of the property to Buyers at closing. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) ("A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. . . . In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent."). To conclude otherwise would render the language of Section 7 superfluous. *See Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011).[9]

For the foregoing reasons, we conclude that Buyers are not entitled to rescind the contract and that Sellers are entitled to summary judgment. Therefore, we affirm the trial court's decision to deny Buyers' motion for summary judgment and to grant Sellers' motion for summary judgment.[10]

---

[9] In so holding, we are undeterred by Buyers argument that Section 7 cannot shift the risk of mistake to Buyers because it does not expressly use the phrase "as is." As discussed above, in *Lenawee County*, the case relied on by this court in *Atkins*, the Michigan Supreme Court held that the parties' contract assigned the risk of mistake to the purchaser of real property. *Atkins*, 823 S.W.2d at 553-54. Notably, however, the contract in *Lenawee County* did not expressly state that the purchasers were accepting the property "as is"; instead, it provided that the purchaser "has examined the property and agrees to accept same in its *present condition*." *Id.* (emphasis added). Accordingly, the absence of express "as is" language in Section 7 of the contract in this case is not dispositive on the issue of whether that provision shifts the risk of mistake to Buyers.

[10] "The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004).

## IV. AWARD OF ATTORNEY'S FEES

Additionally, Buyers contend that the trial court erred by awarding attorney's fees to Sellers pursuant to Section 10 of the Lot/Land Purchase and Sale Agreement, which states:

> **10. Default**. Should Buyer default hereunder, the Earnest Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific performance of the Agreement, or both. Should Seller default, Buyer's Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees.

Buyers argue that this section does not support the relief sought because, under the contract, only suits for breach or enforcement of the agreement entitle the successful party to an award of attorney fees. On the other hand, Sellers contend that an award of attorney fees is appropriate for any "suits filed after Closing which are based on or related to the Agreement."

The interpretation of written agreements, like the contract at issue, is a matter of law that we review de novo on the record without a presumption of correctness. *Allstate Ins. Co*, 195 S.W.3d at 611. In construing contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. *Id*. If the language of a contract is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.*

In this case, the language, "[i]n the event any party hereto shall file suit for breach or enforcement of this Agreement . . . the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees," could be construed as limiting the availability of attorney's fees to only suits for breach or enforcement. However, we believe that the parenthetical language in Section 10 operates to broaden the scope of this provision to include "suits filed after Closing which are *based on or related to* the Agreement." (Emphasis added).

Here, Buyers filed suit after closing to rescind the contract for the sale of real property. This suit is based on or related to the agreement. Therefore, according to the plain language of the parties' contract, Sellers are entitled to an award of costs and attorney's fees.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Buyers.

_____
FRANK G. CLEMENT, JR., JUDGE